Abdallah HIGAZY, Plaintiff,

v.

MILLENNIUM HOTEL AND RE-SORTS, CDL (New York) L.L.C., the Hilton Hotels Corporation, Ronald Ferry, Stuart Yule, and FBI Agent Michael Templeton, Defendants.

No. 02 CIV. 9802NRB.

United States District Court, S.D. New York.

Sept. 30, 2004.

Earl S. Ward, Esq., Robert S. Dunn, Esq., New York, NY, for Plaintiff.

Sean Lane, Esq., Heather K. McShain, Esq., United States Attorney's Office, New York, NY, for Defendant Templeton.

E. Gordon Haesloop, Esq., Neil Mascolo, Esq., Bartlett, McDonough, Bastone & Monaghan, LLP, Mineola, NY, for Defendants Millennium, Hilton and Yule.

Kevin G. Faley, Esq., Morris Duffy Alonso & Faley, New York, NY, for Defendant Ferry.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

On December 17, 2001, the FBI arrested Abdallah Higazy, the plaintiff in this action ("Higazy" or "plaintiff"), as a material witness suspected by the Government of having involvement in or knowledge of the September 11, 2001 attacks on the World Trade Center. These suspicions were founded in large measure on a statement to the FBI by a hotel security guard that a radio bearing a resemblance to a walkie-talkie, along with an Egyptian passport and a Koran, were found locked in a safe in a hotel room adjacent to the site of the attacks. The room had been occupied by Higazy, who had vacated the hotel, along with its other guests, on September 11, 2001. Higazy was ordered detained without bail on December 18, 2001, a status that was renewed ten days later. On January 11, 2002, the Government filed criminal charges against Higazy accusing him of falsely denying ownership or possession or knowledge of the radio. Four days later, the device's true owner—a pilot—came forward. The criminal complaint was promptly dismissed, Higazy was released from his month-long custody, and the security guard was indicted for his false report.

Several claims against the various defendants arise from these events. Through an amended complaint, Higazy alleges that the actions of FBI Special Agent Michael Templeton ("Templeton") violated his Fourth, Fifth and Sixth Amendment rights. Additionally, Higazy's amended complaint includes claims against Millennium Hotel ("Millennium"), the hotel located across from the attack site where Higazy had been staying and where the communications device initially connected to Higazy was found; Millennium's corporate owner, CDL (New York) L.L.C. ("CDL"); Millennium's operator, Hilton Hotels Corp. ("Hilton"); Stuart Yule ("Yule"), Millennium's chief security officer throughout the time relevant to this action; and Ronald Ferry ("Ferry"), a Millennium security employee during the time relevant to this action. Higazy accuses Yule, Ferry, Millennium, Hilton and CDL of false arrest and false imprisonment, malicious prosecution, and intentional infliction of emotional distress. Relatedly, Higazy claims negligent hiring, retention, training and supervision, as well as ordinary negligence, on the part of Millennium, Hilton and CDL.

Each of the defendants except for Fer-

ry[1] now moves for summary judgment pursuant to Fed.R.Civ.P. 56. Specifically, there are two summary judgment motions before the Court—one from Agent Templeton, and the other from Millennium, Hilton, CDL and Yule (collectively, the "Hotel defendants" or the "Hotel"). For the reasons that follow, we grant Templeton's motion and the Hotel defendants' motion with the exception of defendant Yule's motion, which we grant in part and deny in part.[2]

## BACKGROUND

Except where noted, the following factual background is endorsed by the plaintiff and undisputed by Agent Templeton and the Hotel defendants for purposes of this motion only.[3]

### A. The Retrieval of a Communications Device From the Millennium.

The Millennium Hotel is located across the street from the site of the former World Trade Center, and was evacuated and cordoned off shortly after the September 11, 2001 attacks, separating many Hotel guests from their personal belongings. Plaintiff was one of those guests. In either late September or early October, Yule and the other Hotel defendants instituted a plan for retrieving and inventorying guest property, which, *inter alia,* assigned the responsibility of opening locked room safes to security officer Ronald Ferry, a defendant in this action, and the responsibility of inventorying property found in the safes to another hotel employee, Christiana Franco.[4] As part of the process, Ferry and Franco were to place all property recovered from each room and room safe on the floor in the room ending in "01" on each of the hotel's fifty-five floors. On or about October 11, 2001, Ferry retrieved a radio during the sweep and told Yule that it was found in hotel room 5101, inaccurately referred to in the Hotel defendants'

1. Ferry took no part in the briefing of this motion.

2. This case arose from a disregard for the rule of law. Any failure by this Court to abide by controlling precedent because of natural sympathy for Mr. Higazy's plight would only magnify any prior disrespect for the legal system of this country. It is the sincere hope of the Court that Mr. Higazy will understand this opinion in the context just expressed.

3. This factual background is drawn almost entirely from the Local Rule 56.1 statements of each set of defendants and plaintiff's responses thereto. Additionally, the plaintiff has included his own statements of material facts not in dispute. As a statement by a non-moving party is not required by Local Rule 56.1, the defendants have no obligation to respond to these statements (indeed, Agent Templeton did not respond). Both sets of defendants stipulate at the outset of their 56.1 statements that they have assumed the truth of the facts set forth therein *only* for purposes of this motion, and reserve the right to dis-

pute these facts in the future is noted. Also noted is that the various "sets" of defendants that have emerged—Agent Templeton; the Hotel defendants; and Ronald Ferry—are not united in interest and have in fact filed various cross-claims against one another. We recognize that it is therefore possible that certain facts not in dispute on this motion between Higazy and Templeton, or between Higazy and the Hotel defendants, (and potentially between Yule and the Hotel defendants) might be in dispute between the defendants themselves (in their capacity as cross-claimants).

The facts recited by the Honorable Jed S. Rakoff, United States District Judge for this Court for his August 5, 2002 opinion in *In re Application of the United States for Material Witness Warrant for Material Witness No. 38,* 214 F.Supp.2d 356 (S.D.N.Y.2002) at an earlier stage in this saga are remarkably similar to those presented to us in this matter by the parties after months of discovery.

4. Ms. Franco was, evidently, a hotel secretary.

papers as 5501.[5]

Ferry also told Yule that a passport, a yellow metal medallion and copy of the Koran were found with the radio in the room's safe. Yule went up to the room, and, according to an FBI report taken from Yule on January 2, 2002, when Ferry first presented the radio and passport to him, he did not find the objects suspicious and instructed Ferry to "store the device with the rest of the guest's belongings." Declaration of Earl S. Ward of July 7, 2004 ("Ward Decl. II"), Ex. E. But in late November, another hotel employee who was conducting a second inventory of guest property in a make-shift storage locker again brought the radio to Yule's attention. Together with the passport, Yule found the "circumstances to be more sinister" and therefore notified the FBI that he had found "something of interest they should see." *Id.* In the month and a half that lapsed between Ferry's notification to Yule and Yule's call to the FBI, Yule and Ferry did not have a conversation about the radio.

In late November or early December of 2001, following Yule's telephone call, Special Agents Vincent Sullivan and Christopher Bruno of the FBI went to the Millennium Hotel. Yule showed the agents an Egyptian passport and a radio that resembled a walkie-talkie, both of which, Yule explained, were recovered from a guest room when inventorying possessions of guests who were staying in the Hotel on the morning of September 11, 2001. The FBI later determined that the radio was an air-band transreceiver capable of air-to-air and air-to-ground communication.

## B. *Higazy is Detained as a Material Witness (12/17/01)*

On December 17, 2001, plaintiff returned on his own initiative to the Hotel with an appointment to retrieve his belongings. The FBI, having previously been notified that Higazy would be visiting the hotel at this time, dispatched Special Agents Sullivan and Bruno as well as Special Agent Adam Suits to the Millennium. During a three hour interview with the agents, Higazy emphatically denied ownership of the radio. However, Higazy did eventually divulge his past service as a first lieutenant in the Egyptian Air Force and how, through this service, he acquired some familiarity with radio communications devices. *See* Declaration of Heather K. McShain ("McShain Decl."), Ex. E at 29–31.

At the same time as Higazy's interview, the FBI questioned defendant Ferry two times. Each time, Ferry said that he found the radio in Higazy's safe on top of a passport. Apparently armed with Ferry's reiterated claim, the agents re-questioned Higazy about the radio. Higazy again denied ownership. At the conclusion of the interview, the FBI detained Higazy as a material witness.[6]

---

**5.** The Hotel defendants claim, but Higazy denies, that room 5501 was checked out in Higazy's name at the time of the attack and the subsequent hotel evacuation. Higazy does not deny that he had a room at the hotel at this time. He only denies that this was his room number. It is probable that room "5501" is a typographical error repeatedly made by the Hotel defendants in its statement of facts, as many other papers submitted in connection with this motion refer to Higazy staying in room 5101. *See, e.g.,* Hotel defen-

dants' Amended Memorandum of Law in Support of Motion for Summary Judgment at 4. We also surmise that the Hotel defendants also intended in their statement of facts to say that Ferry reported the radio was found in room 5101, and not room 5501.

**6.** Higazy avers and the Hotel defendants acknowledge that after the December 17, 2001 FBI interviews of Higazy and Ferry, Yule spoke with the FBI agents and expressed to

That same day, shortly after Higazy's arrest, another FBI agent and a detective with the New York City Police Department began questioning Higazy. At first, Higazy indicated an interest in cooperating and speaking with the agents, waiving his right to an attorney by signing an advice of rights form. However, Higazy changed his mind and asked for an attorney after declining to sign a form stating that he did not want the Egyptian Consulate notified of his detention. The day's questioning evidently concluded upon this request.

### C. Higazy's First Material Witness Proceeding (12/18/01)

Title 18 U.S.C. § 3144 provides that "[i]f it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may warrant the arrest of the person and treat the person in accordance with the provisions of section 3142 [of Title 18, which is the section concerning bail]." Section 3144 further provides that:

> No material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

On the evening of December 18, 2001, Higazy and his court appointed attorney, Robert Dunn, appeared before The Honorable Jed S. Rakoff of this Court. The hearing began with Judge Rakoff approving a material witness arrest warrant for Higazy based upon an affidavit of Special Agent Bruno testifying to Higazy's possible possession of information bearing on the September 11, 2001 attacks. The hearing then explored the issue of bail. In weighing the evidence assembled by the Government, Judge Rakoff considered the supposed connection between Higazy and the radio; Higazy's possible concealment of his knowledge of radio communications when initially questioned by the FBI, and the fact that Higazy had few ties to the United States and arrived here shortly before September 11, 2001. Based on this initial evidentiary showing Judge Rakoff granted the Government's request to detain Higazy through but not beyond December 28, 2001 (on which date a subsequent conference was scheduled), stating "I want to reemphasize that this is not perhaps the most overwhelming showing on the part of the government." *See* McShain Decl., Ex. I at 41.

### D. Higazy's Polygraph Examination (12/27/01)

During the December 17, 2001 hearing, Mr. Dunn conveyed to the Court his client's interest in taking a polygraph examination. After the hearing, AUSA Daniel Himmelfarb informed Mr. Dunn that the "Government was not really interested in doing a polygraph ... [but t]hey only were relenting to the Judge's invitation to do it." Templeton's Rule 56.1 Statement ("Templeton Stmnt."), ¶ 30.[7] In this regard, as explained to Mr. Dunn, the Government would not place much weight on the polygraph results because if Higazy were a member of Al–Qaeda he could pass it. Further, AUSA Himmelfarb expressed to Mr. Dunn that the polygraph would not

---

them the evidentiary importance of the fact that Ferry found the radio in a safe.

**7.** Judge Rakoff in fact took no position on Higazy's appeal for a polygraph examination.

dissuade the Government in their belief that the radio was found in Higazy's safe. AUSA Himmelfarb and Mr. Dunn discussed the procedures for the polygraph, which included excluding Mr. Dunn from the examination room,[8] but allowing Higazy to speak with Mr. Dunn if he needed to, and limiting the examination questioning.[9]

On or about December 20, 2001, Agent Sullivan contacted Agent Templeton about his availability to conduct Higazy's polygraph. Prior to being contacted by Agent Sullivan, Agent Templeton never had contact with Higazy and knew nothing about the matter. Before the examination, Agents Sullivan and Bruno met with Templeton and provided him an overview of the Higazy investigation, including the various theories they had regarding the possible use of the radio.

The polygraph examination was scheduled for December 27, 2001 at the United States Attorney's Office in New York. Dunn and Higazy had the opportunity to confer prior to the examination. Before commencing the questioning, Agent Templeton explained to Higazy his rights, and Higazy executed two consent forms.[10] Higazy first signed an Advice of Rights form in which he was advised of his right to remain silent and speak with an attorney at any point during the examination. He also signed a "Consent to Interview with Polygraph" form.

The questioning was initiated with a "pre-test interview," during which Agent Templeton examined Higazy about his background, his scholarship to study in the United States, and his family in Egypt.

Before placing the polygraph machine's components on Higazy, Agent Templeton informed him that the following questions would be asked: Are you an Egyptian citizen? Are you a U.S. citizen? Do you have a scholarship? Did you have anything to do with September 11, 2001? Once the machine components were attached, Agent Templeton proceeded through this same set of questions twice. Based on the results, Agent Templeton found that Higazy's answers to the questions relating to Higazy's involvement in the attacks were deceptive.

At the end of the second series of questions, Higazy requested that Agent Templeton stop because he could not breathe and because he felt pain in his arm. Templeton removed the polygraph's components from Higazy and left the room to get him water. Upon Templeton's return, Higazy asked, "Has this ever happened to anyone before?" Templeton Stmnt. ¶ 69. Templeton answered that "[i]t never happened to anyone who told the truth." *Id.* ¶ 70.

At this point, Higazy provided Templeton what would prove to be a series of false confessions, the sequence and motivation of which is not entirely agreed upon

**8.** It is FBI policy that attorneys not be in the same room where the polygraph examination is being conducted.

**9.** Templeton and Higazy dispute the parameters set on the questioning. According to Templeton, the questioning was to be limited to the issue of the radio and how it related to the World Trade Center attacks. Higazy disputes this and states that Mr. Dunn requested that only one question be asked—"Did you have anything to do with 9/11?" Plaintiff's Statement in Response to [Templeton's] State-

ment of Material Facts ("Pl. Stmnt."), ¶ 35. That question was the only substantially related one asked.

**10.** This form was identical to the one Higazy executed the day he was arrested as a material witness. Pursuant to FBI procedures, before a polygraph is conducted the subject is informed of his right to remain silent and his right to an attorney, and is then asked to waive those rights and consent to the polygraph interview.

by Higazy and Templeton on this motion. According to Higazy, he was asked if he stole the radio, to which he responded that the radio was his and was found across the street in a downtown Manhattan electronics store near the Hotel and the World Trade Center site. Both Higazy and Templeton agree that Higazy then recanted this story by disavowing ownership or possession of the radio. Agent Templeton next banged on the table and told Higazy to tell him the truth.[11] Higazy then claimed he found the radio at the base of the Brooklyn Bridge, but once again recanted this story and said the radio was not his. And once again, Templeton banged on the table and demanded the truth.[12]

Finally, Higazy explained to Templeton that he stole the radio from the Egyptian Air Force[13] and used it to eavesdrop on telephone conversations. Higazy did not recant this version. Agent Templeton next prepared a written statement for Higazy to sign that included this explanation.

Higazy did not sign the statement, but instead requested for the first time during the session to see his attorney. Agent Templeton immediately retrieved Mr. Dunn, who met with Higazy and, according to Higazy's handwritten affidavit, said: "You were lying to me?" Higazy replied: "No, but I thin [sic] it's the best option in front of me." McShain Decl., Ex. F at 5. Dunn advised Higazy not to sign the statement. Dunn left the room stating Higazy would not sign the statement because it varied from Higazy's prior statements of having no connection to the radio.

No further questioning was conducted that day and Higazy was returned to the facility where he was being held. An independent reviewer of Higazy's polygraph results found deception in his answers.

### E. *Higazy's Second Material Witness Hearing (12/28/01)*

As previously scheduled, a second material witness hearing was held before Judge Rakoff the day after the polygraph examination.[14]

The parties agree that Higazy did not anticipate being released from custody at the time of this second hearing because Higazy knew he could not prove the radio was not his. Indeed, Dunn and AUSA Himmelfarb made a joint application to continue to hold Higazy as a material witness. Dunn consented to an adjournment of the proceeding and Higazy's continued detention so the parties could resolve whether to proceed by proffer, grand jury testimony or completion of the polygraph that the parties evidently did not consider complete. Agent Templeton did not attend the hearing or provide the Court an

11. According to Higazy, Templeton banged on the table repeatedly throughout the polygraph, accusing him of lying.

12. Higazy claims that this demand was accompanied by threats against him. Additionally, Higazy states that (1) during the polygraph examination Agent Templeton screamed at him and was so enraged at one point that his face turned red; (2) Higazy feared Templeton would hit him; (3) Templeton informed plaintiff that he was facing thirty years of imprisonment; and (4) he was too scared to recall that his lawyer was outside the room. For purposes of this motion, it is undisputed that during the pre-test interview Agent Templeton threatened Higazy that the "FBI [would] make [Higazy's] brother upstate live in scrutiny" and otherwise threatened his family. Templeton Stmnt. ¶ 58.

13. It was previously established that Higazy served in the Egyptian Air Force.

14. The record shows that Judge Rakoff's intention for reconvening ten days after the first hearing was to revisit Higazy's detention after he had met with an investigating grand jury. Higazy never met with the grand jury.

affidavit or other written statement in connection with the proceeding.

In considering the joint application, Judge Rakoff expressed the following:

I am concerned that a witness not be held for a prolonged period of time simply on the basis of being a material witness. [The initial] [t]en days struck me as fairly lengthy, but there was the intervening holidays, and now apparently on consent you're asking for another ten days. I would be very, very loath to extend it beyond then absent truly new developments .... Now the Court's determination as to bail was premised on several factors, but the most salient were the lack of ties to the community and the glaring fact that the transmitter device had been found ... in the safe in the room he occupied, and in the same safe was the passport identifying him and so forth.

McShain Decl., Ex. I at 9–10.

Judge Rakoff then inquired about whether anything changed with respect to those bail considerations. AUSA Himmelfarb responded affirmatively and then proceeded to state that Higazy had abandoned his initial contention that the radio was not his and that "[h]e has admitted it is his radio, and he has provided I believe about three different versions of where it came from." *Id.* at 11. Weighing in, Mr. Dunn stated "I wasn't in the room when whatever discussions were had between Mr. Higazy and the agent where it's now being alleged that he's recanted his earlier statement that it wasn't his and he's saying now that it is. In my speaking with him there's some ambiguity with regard to that issue that remains, and I just want to say that to the Court." *Id.* at 12.

In response to this development, Judge Rakoff stated:

The long and the short of it is the determination that I made previously

was somewhat of a closer call than might have otherwise been the case in a situation of this sort because of the very strong representations that were being made to the Court by the witness through his counsel, and some statements were made to the pretrial services directly out of the witness's own mouth. So it seems to me, I just want the record to reflect this, that it no longer strikes me as even an arguably close call whether to detain him, given the apparent unreliability or inconsistency between what was previously represented and what I am now being advised is the situation. I don't think there's much room for ambiguity in this area. Either it's his device or it's not his device in the sense of possession. If he placed it in the safe, for example, that's completely, totally inconsistent with what was being represented before.

*Id.*

Judge Rakoff then stated that "the Court accepts the joint application of the parties to adjourn this matter and to continue to detain [Higazy] without bail." *Id.* at 13. The next hearing was scheduled for January 14, 2002.

### F. *The Criminal Complaint Against Higazy (1/11/02)*

The parties failed to agree on the terms of a second polygraph examination so another one never took place. The government re-interviewed Ferry, and, on January 11, 2002, AUSA Himmelfarb approved a one-count, five-page criminal complaint sworn out by Agent Bruno. The complaint alleged in pertinent part that: a "hotel security officer" at the Millennium informed the FBI that a radio capable of air-to-air and air-to-ground communication was found in a safe (situated on top of an Egyptian passport and an Arabic book) in

hotel room 5101, a room occupied by Higazy on September 11, 2001; Higazy, during his December 17, 2001 interview with the FBI, stated that he had served in the Egyptian Air Corps and had some expertise in communications devices; Higazy, when shown the radio, denied that it was his, that he had ever before seen it, or that it could have been found in his room; during a re-interview with the FBI, Higazy revealed that one of his duties in the Egyptian service was to repair radios used by pilots to communicate with people on the ground, but that he had no knowledge of this particular radio. The complaint charged Higazy with making false statements to the Government in the course of a criminal investigation in violation of 18 U.S.C. § 1001(a).

Magistrate Judge Maas of this Court found probable cause for the complaint and signed it on January 11, 2002. Higazy was arraigned that day. The complaint made no reference to the polygraph examination or the confessions Higazy made at the conclusion of the examination. However, during the arraignment AUSA Himmelfarb argued that one of four reasons Higazy should be denied bail was because on each occasion he had been questioned about the radio, Higazy had lied: "[On December 27, 2001], [h]e was questioned about the radio. At first [he] denied ownership of the radio and later admitted ownership of the radio but told three different versions of how he had come into possession of the radio. So this is not somebody who can be deemed trustworthy." Declaration of Earl Ward of April 9, 2004 ("Ward Decl."), Ex. C at 13–14. After a considered review of this and other relevant evidence and factors, Judge Maas ordered Higazy to be held without bail.[15]

### G. The Government's Request to Dismiss Its Criminal Complaint

On January 14, 2002, Joseph Verde, a chef for Millennium who, in the post-attack recovery phase, was placed in charge of returning abandoned items to former guests, was approached by an airline pilot who had been staying on the hotel's 50th floor. He had gone to the Millennium to reclaim his abandoned property and noticed that his radio was missing from the collection of items returned to him. Verde immediately contacted Special Agent Bruno at the FBI to relay this development.[16] The FBI verified to its satisfaction that the radio was in fact the pilot's, and not Higazy's, and that the pilot had not had any interaction with Higazy. During a re-interview by the FBI at this time, Ferry, the hotel security officer who first claimed to have discovered the radio in the safe in Higazy's room, revised his account and stated that the radio was found on a table in Higazy's room and not in the safe.

Although at the time it was unclear (and on the record remains so) how the radio was transferred from the 50th floor to the 51st floor of the Millennium, the Government on January 16, 2002 requested the dismissal of the complaint against Mr. Hi-

---

**15.** The Court notes that Judge Maas did not rely on or address Higazy's putative confessions in explaining his decision to hold Higazy without bail. Rather, he reasoned that the likelihood of Higazy's conviction (without reference to the statements made after his polygraph examination) and his lack of substantial ties to the United States were sufficient to deny Higazy bail.

**16.** Verde next informed defendant Yule that he had notified the FBI about the pilot, to which Yule asked in response, "Why the f—k did you do that?" Plaintiff's Statement of Additional Undisputed Facts of July 7, 2004 ¶ 49 (expletive modified). Yule denies making this comment. Deposition of Stuart Yule, Declaration of E. Gordon Haesloop of May 10, 2004 ("Haesloop Decl."), Ex. B. at 109.

gazy and his immediate release. These applications were granted.

## H. *Defendant Ronald Ferry's Criminal Proceedings*

After Higazy was cleared of the charges against him, the Government filed an information against Ronald Ferry accusing him of lying to Government agents from December 17, 2001 through January 15, 2002, in the course of their investigation of the radio. On May 30, 2002, Ferry pled guilty to this charge and was sentenced to three years probation plus six months of intermittent confinement on weekends at a community corrections center, halfway house or similar residential facility. *See United States v. Ronald Ferry*, 02 Cr. 221(GBD). A pre-sentence letter submitted to the court on Ferry's behalf by his counsel made no claim or suggestion that Ferry acted at the request or direction of any of the Hotel defendants. While it was reported at the time that the United States Attorney's investigation was continuing, no additional indictments or complaints were filed against any other employee of the hotel, such as defendant Yule.

The facts surrounding the hiring of Mr. Ferry at Millennium are not disputed. On January 6, 1996, he completed a job application and interviewed with Millennium's Human Resources Department and his future department head, defendant Yule. An employment verification form was sent to Ferry's then-current employer, Burns Security. That form was completed to Millennium's satisfaction and contained no negative comments on Ferry's work history. Prior to working at Burns Security, Ferry had resigned from the Newark Police Department, and abused drugs and alcohol before and throughout his tenure with Millennium.[17]

## I. *Judge Rakoff's Post–Dismissal Proceedings*

Upon learning that the radio's true owner had come forward, and that the formal charges against Higazy had been dismissed, Judge Rakoff *sua sponte* convened a telephonic conference to "inquire into the circumstances that led, seemingly unwittingly, to the Government's material misrepresentations to the Court." *See In re Application of the United States For Material Witness Warrant for Material Witness No. 38*, 214 F.Supp.2d 356, 357 (S.D.N.Y.2002) (hereinafter "*Material Witness*"). Judge Rakoff requested briefing on these concerns and whether the court had authority and reason to initiate contempt proceedings or commence a factual investigation. In brief, Judge Rakoff concluded that the alleged misconduct on the part of Agent Templeton did not fall within the court's criminal contempt jurisdiction, *see id.* at 361, and that it was sufficient to direct the Government to complete an investigation it had already voluntarily undertaken into the suspected misconduct and report its findings to the court. *See id.* at 363.

## J. *Summary of the Causes of Action in Higazy's Amended Complaint*

The amended complaint in this action presses eight separate claims against various combinations of the six defendants. The first three causes of action allege violations of the Fourth, Fifth and Sixth Amendments, and are solely directed against the Government defendant. The remainder of the amended complaint raises claims against the Hotel defendants.

---

**17.** Though these facts are admitted by the Hotel defendants for this motion, there is no allegation by Higazy or admission by the Hotel defendants that they knew this information prior to or during Ferry's employment at the Millennium.

All of the Hotel defendants are accused either directly or vicariously of committing false arrest/imprisonment, malicious prosecution and intentional infliction of emotional distress. Additionally, the Employer Entities within this class of defendants— Millennium, Hilton and CDL (hereinafter the "Employer Entities")—are the subject of Higazy's claims of negligent hiring/retention/training/supervision as well as simple negligence.

## DISCUSSION

### I. Standard For Summary Judgment

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Frito–Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir.1993). In order to defeat a motion for summary judgment, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation marks omitted). All evidence is reviewed "in the light most favorable to the party opposing the motion," and we are to "resolve ambiguities and draw reasonable inferences against the moving party." *Frito–Lay*, 10 F.3d at 957. However, the " 'mere existence of a scintilla of evidence' supporting the non-movant's case is ... insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir.2003) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). A party will not withstand a motion for summary judgment with evidence which "is merely colorable, or ... not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### II. Agent Templeton's Motion For Summary Judgment

Agent Templeton asserts two separate bases upon which he urges the court to grant him summary judgment on Higazy's claims under the Fourth, Fifth and Sixth Amendments. First, Agent Templeton claims qualified immunity from this lawsuit insofar as Higazy seeks to vindicate constitutional rights that Templeton maintains were either not violated or not clearly established at the relevant time. Second, Agent Templeton argues that he is entitled to summary judgment against all of plaintiff's claims because plaintiff cannot establish an adequate causal link between the alleged harm Higazy claims and Templeton's conduct. These arguments are considered below.

The doctrine of qualified immunity has traditionally operated to protect government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kerman v. City of New*

*York,* 374 F.3d 93, 108 (2d Cir.2004) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Courts appraising a qualified immunity defense "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (citations omitted). If a court finds that the defendant's actions and conduct abridged an actual constitutional right, it will "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.*[18] For purposes of this analysis, "clearly established" means that:

> the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 614–15, 119 S.Ct. 1692. Furthermore, "[t]he matter of whether a right was clearly established at the pertinent time is a question of law." *Kerman,* 374 F.3d at 108.

1. *Alleged Violation of the Right Against Unreasonable Seizure*

■ Higazy alleges that on December 27, 2001, Agent Templeton impermissibly used coercion, threats and intimidation to extract a false post-arrest confession from him, and that this confession was subsequently used by the Government to support plaintiff's continued detention. According to Higazy's amended complaint, his continued detention violated his Fourth Amendment right to be free from an unreasonable seizure.[19]

■ Higazy does not challenge the reasonableness of his arrest of December 17, 2001. Instead, his Fourth Amendment allegation is directed only at the acquisition and use of a confession he gave after his arrest. Under these circumstances, Higazy's argument is misplaced as the Fourth Amendment "governs the legitimacy of the arrest and its incidents", *Brady v. Dill,* 187 F.3d 104, 108 (1st Cir.1999), not the post-detention deprivation complained of here. Because Higazy "does not challenge the validity of the arrest itself … the Fourth Amendment … is not at issue." *Brady,* 187 F.3d at 108; *see Brothers v. Klevenhagen,* 28 F.3d 452, 456 (5th Cir. 1994) ("[T]he text of the Fourth Amendment—prohibiting unreasonable 'seizures'—does not support its application to a post-arrest encounter."); *Villanova v. Abrams,* 972 F.2d 792, 797 (7th Cir.1992) (observing that "the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made"); *see also Baker v. McCollan,* 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (noting that "arrest pursuant to probable cause is itself

---

**18.** "This order of procedure is designed to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit. Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Id.* (citations and quotations omitted).

**19.** It is unclear whether Higazy is pursuing this claim since his Memorandum in Opposition to [Templeton's] Motion for Summary Judgment does not address his Fourth Amendment claim or respond to the arguments made by Templeton for granting summary judgment on this claim. Nonetheless, we address it.

sufficient [under the Fourth Amendment]"). Higazy's Fourth Amendment claim is therefore dismissed.

### 2. Alleged Violation of the Right Against Self–Incrimination

■ Higazy claims that the use of the confession [20] he provided during what was supposed to be a routine polygraph examination violated his Fifth Amendment right against self-incrimination. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. United States v. Balsys, 524 U.S. 666, 672, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (quoting Kastigar v. United States, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)).

■■ The issue here is not the proper invocation of the privilege, but rather when and how it is violated. In the recently decided Chavez v. Martinez, 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), the Supreme Court held that a coerced confession cannot serve as the basis for a 42 U.S.C. § 1983 action when that confession was never used in a criminal case. Id. at 766, 123 S.Ct. 1994. In other words, "a violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." Id. at 770, 123 S.Ct. 1994 (emphasis in original). Thus, under Chavez, for an individual to assert a constitutional claim (i.e., one for damages) for a violation of his Fifth Amendment right he must establish that the statement was used in a "criminal case."

Relying in part on Chavez, Templeton contends that he is entitled to summary judgment on this claim because the confession was not in fact used in a criminal case and as such there can be no finding of a constitutional violation.

Justice Thomas in Chavez declined to identify the "precise moment when a 'criminal case' commences," but did conclude that "police questioning does not constitute a 'case'" and that a "criminal case" as the term is used the Fifth Amendment "at the very least requires the initiation of legal

---

**20.** Templeton's memoranda do not specifically address the question whether Higazy's statements during the lie detector interrogation were coerced. Rather, they address whether Templeton's actions meet the "shocks the conscience" test for establishing a violation of Higazy's rights under the Due Process Clause (infra section 3), rather than whether Templeton's actions overbore Higazy's will, making his confession involuntary and violating his rights under the Self–Incrimination Clause. For the purposes of this discussion, we therefore assume that Higazy's confession was coerced in the sense that his will was overborne.

Although we assume Higazy's confession was coerced for this decision, we also note that many facts in the record point toward the opposite conclusion. Higazy signed a form advising him that he could speak with his attorney at any point during questioning; Higazy's attorney was outside the room; Templeton removed the components of the polygraph machine from Higazy after he complained of discomfort, and brought him a glass of water. Moreover, many of the facts upon which Higazy relies would not be sufficient to support a finding of coercion (e.g., banging on the table). The "totality of the circumstances" test for determining if law enforcement's conduct overbore someone's will to resist is fact intensive, so conceding the issue of coercion for the purposes of argument (while reserving the right to latter challenge the "undisputed" facts) may be appropriate here.

proceedings." *Id.* at 766, 123 S.Ct. 1994. There is also authority in this Circuit that predates *Chavez*, holding that use of a confession before the grand jury that leads to defendant's indictment violates the prohibition against compelled self-incrimination. *Weaver v. Brenner*, 40 F.3d 527, 536 (2d Cir.1994).

Relying on Judge Scheindlin's April 2002 decision in *United States v. Awadallah*, 202 F.Supp.2d 55 (S.D.N.Y.2002), *rev'd* 349 F.3d 42 (2d Cir.2003), which held that the term "criminal proceeding" in the material witness statute does not apply to grand jury proceedings, Templeton argues that "as of December 2001 the law was not clearly established that a material witness proceeding was a criminal proceeding." Templeton Rep. Mem. at 9. Such reliance is unavailing. As the Second Circuit Court of Appeals noted in reversing *Awadallah*, "[w]hen Congress enacted § 3144—and until the district court ruled otherwise in this case—there was a settled view that a grand jury proceeding is a 'criminal proceeding' for purposes of the material witness statute." *United States v. Awadallah*, 349 F.3d 42, 55 (2d Cir.2003). The district court's opinion in *Awadallah* was not only aberrational, but was not even part of the legal landscape when Higazy's confession was obtained. Thus, a reasonable law enforcement officer in 2001 would have proceeded under the understanding that grand jury proceedings were criminal proceedings.

▆▆▆ Having resolved that the *Awadallah* opinions did not reflect uncertainty in the law, we focus on whether reference to a coerced confession in a bail proceeding constitutes use in a "criminal case" for the purposes of the Fifth Amendment. *Chavez* reminds us that "mere coercion does not violate the text of the Self–Incrimination Clause absent use of the compelled statements in a criminal case against the witness." *Chavez*, 538 U.S. at 769, 123 S.Ct. 1994. To illustrate the types of use that might qualify for Fifth Amendment protection, the Court noted that compelled statements may clearly not be used at trial, *id.* at 767, 123 S.Ct. 1994, and provided some guidance for less archetypal uses:

> In our view, a "criminal case" at the very least requires the initiation of legal proceedings. See *Blyew v. United States*, 80 U.S. (13 Wall.) 581, 595, 20 L.Ed. 638 (1871) ("The words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning a proceeding in court, a suit, or action" (emphasis added)); Black's Law Dictionary 215 (6th ed.1990) (defining "[c]ase" as "[a] general term for an action, cause, suit, or controversy at law ... a question contested before a court of justice" (emphasis added)).

*Id.* at 766. *Chavez* thus establishes a continuum where, at one end, a trial counts as a "criminal case," and, at the other, the period before initiation of legal proceedings does not. *Id.* at 766–67, 123 S.Ct. 1994. The *Weaver* decision provides an intermediate point along that continuum, demonstrating that introducing compelled statements before a grand jury as the basis of an indictment counts as use in a "criminal case." [21]

---

**21.** Another possible use one might postulate is the impact on prosecution and defense counsel from the results of a compelled confession. Indeed, there were such impacts here. One presumes that the finding of deception enhanced the prosecution's confidence, and, as reflected in the transcript before Judge Rakoff, diminished defense counsel's confidence in his client's denials. Such impacts, lacking any testimonial quality and not necessarily related to an actual criminal proceeding, we submit, cannot, consistent with *Chavez*, constitute use in a criminal case.

AUSA Himmelfarb mentioned Higazy's confession before Judge Rakoff during Higazy's second material witness proceeding, and again before Judge Maas during Higazy's arraignment, both times as part of arguments for detention instead of bail. We emphasize here that Higazy's statements were not the basis of the criminal complaint; that complaint accused Higazy of making false statements with regard to things he said before the polygraph.

■■■ The issue before us then is what the caselaw at the time said about where in the Fifth Amendment self-incrimination use continuum references to "coerced" statements made in support of restrictive (or no) bail conditions fall. At the time of the bail arguments concerning the plaintiff, there was no case authority discussing, let alone holding, that the Fifth Amendment could be violated by references to involuntary confessions in the context of a bail hearing. Nor are we aware of such case law even today. Given the uncertainty of the application of the Fifth Amendment in this context, we cannot say that agent Templeton's actions (even if we assume *arguendo* that he would have anticipated the use of the statements in a bail context) were "objectively unreasonable in light of clearly established law." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir.2001) (*citing Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995)). We find, therefore, that Agent Templeton prevails in his qualified immunity defense.[22]

■■■ Templeton's second argument is that he is entitled to summary judgment because plaintiff cannot establish a causal

link between his alleged conduct and Higazy's continued detention. In light of our resolution of the qualified immunity issue we do not need to reach this alternative argument. Nonetheless, to complete the description of the legal debate, we summarize defendant's argument. At the outset, we note that defendant's argument must be evaluated under the principle that "tort defendants, including those sued under § 1983, are responsible for the natural consequences of [their] actions." *Kerman v. City of New York*, 374 F.3d 93, 126 (2d Cir.2004) (quotations and citations omitted). Templeton cites to a number of potentially intervening causes. Among them are Dunn's consent to Higazy's continued detention, the independent judgment of Judges Rakoff and Maas, and the decision of AUSA Himmelfarb to charge Higazy with making false statements to the FBI not based on any statement connected to the polygraph or Agent Templeton, but rather on Agent Bruno's affidavit. Templeton Mem. at 15–18; Templeton Rep. Mem. at 1–4. *See generally Zahrey v. Coffey*, 221 F.3d 342 (2d Cir.2000).

The issue of causation may be viewed from another perspective as well. Templeton may argue (as he has already to some extent) that because of other factors, wholly apart from any statements obtained, there was no ultimate impact from any use of Higazy's allegedly coerced statements. An analogy can be drawn to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Franks* addressed the situation in which a law enforcement officer knowingly and intentionally includes a false statement a search warrant affidavit.

---

**22.** Indeed, regardless of precedent, a reference to an involuntary confession at a bail hearing does not clearly—if at all—constitute being compelled to be a witness against oneself in a criminal case. One reason is that, unlike a decision to prosecute or during a trial, "pretrial detention under the Bail Re-

form Act is regulatory, not penal." *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Bail determinations focus on the likelihood of a defendant appearing for trial and / or dangerousness if released.

The Court held that a search warrant need not be set aside as long as, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 171–72, 98 S.Ct. 2674. In this case, we can examine whether, after setting to one side any coerced confession from the record of a detention hearing, a judge could still have found that "no condition or combination of conditions [would have] reasonably assure[d] the appearance of the person as required." 18 U.S.C. § 3142(e) (2000). If we conclude that a judge could have done so, then those responsible for obtaining and introducing the arguably coerced confession cannot be said to be the cause of the person's detention. *Cf. Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity not available to a reasonably well-trained officer who would have known that his affidavit failed to establish probable cause). For example, Judge Maas made no reference to Higazy's confession in his analysis of whether to detain Higazy, relying instead on the likelihood of Higazy's conviction for making false statements, his lack of significant ties to the United States and the absence of a proffered bail package in his decision to deny Higazy bail. *Cf. Rothstein v. Carriere,* 373 F.3d 275, 295 (2d Cir.2004) (holding that "[i]f the criminal prosecution was otherwise supported by probable cause, for example, the malicious prosecution claim is unavailable, even if the accuser lied.").

For the foregoing reasons, we grant Templeton's motion for summary judgment on the self-incrimination claim.

3. *Alleged Violation of Fifth Amendment Due Process Rights*

 Higazy also claims that Agent Templeton's coercive conduct violated his Fifth Amendment due process rights. The Fifth Amendment's substantive due process guarantee "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (quotations and citations omitted). The Supreme Court has repeatedly stressed that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense" and that the actions "most likely to rise to the conscience-shocking level" are those "intended to injure in some way unjustifiable by any government interest." *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

In addressing this very high threshold, the Second Circuit Court of Appeals has explained that "[s]ubstantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994). The classic cases of substantive due process violations are egregious invasions of individual rights. *See, e.g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (breaking into suspect's bedroom, forcibly attempting to pull capsules from his throat, and pumping his stomach without his consent). *See also Chavez,* 538 U.S. 760, 787 n. 1, 123 S.Ct. 1994 (Stevens, J., concurring in part and dissenting in part) (citing *Oregon v. Elstad,* 470 U.S. 298, 312 n. 3, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (collecting cases where coercive police interrogation procedures were held to violate the Due Process Clause)). Particularly in view of the judiciary's well-established deference to the Government's choice of investigatory methods, *see United States v. Myers,* 692 F.2d 823, 843 (2d Cir.1982), the burden of establishing outrageous investigatory conduct is heavy in-

deed. *See United States v. Schmidt,* 105 F.3d 82, 91 (2d Cir.1997).

 Higazy claims that he was "scared" and "horrified," Pl. Stmnt. ¶ 114, by Templeton's threats to have the "FBI ... make [his] brother upstate live in scrutiny" and otherwise threatened his family. *Id.* ¶¶ 58, 117.[23] Even assuming the truth of all of Higazy's accusations and the sincerity of the inferences he drew from them at the time, Templeton's conduct and threats as a matter of law cannot be classified as conscience-shocking or constitutionally oppressive. Templeton's alleged threats, whether intended to coax a confession or arbitrarily frighten, may be the subject of proper criticism, but they are not actionable under the Fifth Amendment's due process clause. *See, e.g., Cruz–Erazo v. Rivera–Montanez,* 212 F.3d 617 (1st Cir.2000); *Pittsley v. Warish,* 927 F.2d 3 (1st Cir.1991); *S.M. v. Lakeland School Dist.,* 148 F.Supp.2d 542, 548 (M.D.Pa.2001), *aff'd,* 33 Fed.Appx. 635 (2d Cir.2002) (collecting cases in which verbal threats did not amount to conscience-shocking conduct). Higazy has cited no cases, and we are aware of none, finding a due process violation where the agents' actions were limited to verbal threats and there was unrestricted access to counsel outside the room. Templeton's actions thus were not "objectively unreasonable in light of clearly established law," *Ford v. Moore,* 237 F.3d at 162, and Agent Templeton is entitled to qualified immunity.

### 4. *Alleged Violation of Sixth Amendment Right to Counsel*

 Higazy's Sixth Amendment claim fails at the threshold. As Templeton correctly points out, Higazy does not present the Court with any case in which a plaintiff successfully raised a *Bivens* or § 1983 action to redress the deprivation of counsel (under either the Fifth or Sixth Amendment)[24] in the abstract. Indeed, one federal court recently stated that it had "been unable to find a single case where the plaintiff was awarded money damages under a § 1983 claim for deprivation of the right to counsel." *Bradley v. Health Midwest, Inc.,* 203 F.Supp.2d 1254, 1259 (D.Kan.2002). That court cited to an opinion from this District which stated "[a]dmittedly, this court is unaware of any case in which money damages have been awarded for the deprivation of counsel." *O'Hagan v. Soto,* 523 F.Supp. 625, 630 (S.D.N.Y. 1981).

 The absence of such claims is not surprising, as the actual civil injury allegedly suffered as a result of the deprivation of counsel Higazy claims relates entirely to the provoked confession—an injury that can be remedied by claiming a violation of either the right against self-incrimination or due process, as Higazy has done. As such, the claim entirely duplicates Higazy's Fifth Amendment claims (violation of right against self-incrimination and violation of due process rights). If Higazy was not injured as a result of a breach of either his right against self-incrimination or due process, we cannot perceive what injury was caused by his supposed deprivation of counsel. If Higazy was injured as a result of a breach of either of his right against self-incrimination or due process, we likewise cannot perceive an additional remedy

---

**23.** A more detailed statement is not included to respect the parties' request for confidentiality.

**24.** As Templeton suggests, there is a question as to whether the relevant right to counsel

that Higazy was arguably denied was vested by the Sixth Amendment or the Fifth Amendment. It is not necessary to address or resolve this issue in deciding this motion.

to which he should be entitled by pursuing the deprivation of counsel claim. Justice Souter's comments in *Chavez* are apropos here. Criticizing the plaintiff's Fifth Amendment claim, Justice Souter wrote:

> The most obvious drawback inherent in Martinez's purely Fifth Amendment claim to damages is its risk of global application in every instance of interrogation producing a statement inadmissible under Fifth and Fourteenth Amendment principles, or violating one of the complementary rules we have accepted in aid of the privilege against evidentiary use. If obtaining Martinez's statement is to be treated as a stand-alone violation of the privilege subject to compensation, why should the same not be true whenever the police obtain any involuntary self-incriminating statement, or whenever the government so much as threatens a penalty in derogation of the right to immunity, or whenever the police fail to honor *Miranda?* Martinez offers no limiting principle or reason to foresee a stopping place short of liability in all such cases.

*Chavez*, 538 U.S. at 778–79, 123 S.Ct. 1994 (Souter, J., concurring). A similar problem faces Higazy's attempt to treat as a "stand-alone violation subject to compensation" an alleged Sixth Amendment deprivation of counsel.[25]

■ Finally, it must be recalled that Higazy's claims against Templeton are *Bivens* claims and, as such, Templeton is entitled to assert a qualified immunity defense. As the preceding discussion makes clear, there was no authority at the time that Templeton conducted the polygraph examination suggesting that any of his actions constituted a violation of the Sixth Amendment. In these circumstances Templeton is clearly entitled to the benefit of the qualified immunity defense. For this reason and the others set forth, Templeton's motion for summary judgment on Higazy's Sixth Amendment claim is granted.

### III. *The Hotel Defendants' Motion For Summary Judgment*

The four Hotel defendants argue that they are entitled to summary judgment dismissing all of the claims against them for reasons assessed below.

### A. *The Employer Entities' Alleged Vicarious Liability*

■ Millennium, CDL and Hilton—Ferry's and Yule's employers—maintain that they cannot be held vicariously liable for Ferry and Yule's actions because those

---

25. Higazy's reliance on *Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), is unavailing. In *Wyrick*, a Fifth Amendment decision, the Supreme Court held that a suspect who requests a polygraph examination "waive[s] his right to have counsel present at 'post-test' questioning, unless the circumstances change[] so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." *Wyrick*, 459 U.S. at 47, 103 S.Ct. 394 (citing *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). Neither exception resulting from changed circumstances applies here. The assertions concerning Templeton's actions *after* the polygraph equipment was removed do not as a matter of law rise to a Fifth Amendment violation. Furthermore, it must be recalled that Higazy's attorney was outside the room and was summoned by Templeton as soon as Higazy requested to speak with him. Moreover, as *Wyrick* noted, "[d]isconnecting the polygraph equipment effectuated no significant change in the character of the interrogation" as "[m]erely disconnecting the polygraph equipment could not remove . . . knowledge from [the suspect's] mind" that he could stop the questioning at any time. Thus, the fact that the polygraph components were removed did not signal a new interrogation for which a new waiver was required. *Id.* at 47–48, 103 S.Ct. 394.

actions were not undertaken within the scope of their employment.[26]

■■■ Under the doctrine of *respondeat superior*, an employer is vicariously liable for torts committed by its employees acting within the scope of their employment. *See Riviello v. Waldron*, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302, 391 N.E.2d 1278 (1979). New York courts consider five factors when deciding whether an action falls within an employee's scope of employment: (1) the connection between the time, place and occasion for the act; (2) the history of the relationship between the employer and employee as spelled out in actual practice; (3) whether the act is one commonly done by such an employee; (4) the extent of departure from normal methods of performance; and (5) whether the specific act was one that the employer could reasonably have anticipated. *See Haybeck v. Prodigy Services Co.*, 944 F.Supp. 326, 329 (S.D.N.Y.1996).

■■■ Although all five factors are to be given consideration, New York courts generally emphasize the fifth factor—whether the acts involved in the case could have been reasonably anticipated by the employer. *See Essig v. United States*, 675 F.Supp. 84, 87 (E.D.N.Y.1987). Significantly, to be held vicariously liable an "employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." *Riviello*, 47 N.Y.2d at 304, 418 N.Y.S.2d at 303, 391 N.E.2d 1278. Accordingly, "[w]here the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment." *Id.* at 305, 418 N.Y.S.2d at 304, 391 N.E.2d at 1282.

■■■ However, "an employee's actions are not within the scope of employment unless the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business. Thus, where an employee's conduct is brought on by a matter wholly personal in nature, the source of which is not job related, his actions cannot be said to fall within the scope of his employment." *Davis v. City of New York*, 226 A.D.2d 271, 272, 641 N.Y.S.2d 275, 276 (1st Dep't 1996); *see also Lowy v. Travelers Prop. and Cas. Co.*, 99 Civ. 2727, 2000 WL 526702 at *3 (S.D.N.Y. May 2, 2000) (considering in scope of employment analysis "whether the acts were intended to further the employer's interests and not just the actor's personal interests") (citations omitted). While a vicarious liability determination is ordinarily a jury question, a determination as a matter of law is appropriate in the absence of conflicting evidence. *Adorno v. Correctional Services Corp.*, 312 F.Supp.2d 505, 516 (S.D.N.Y. 2004) (citations omitted).

Ferry's alleged intentional torts—false imprisonment, malicious prosecution and intentional infliction of emotional distress—cannot be attributed to the Employer Entities under a theory of *respondeat superior*. Ferry has indicated that his acts were undertaken in a misguided sense of patriotism, which is a personal

---

**26.** While for the remainder of this section we will refer only to Ferry, as his acts are not disputed (in contrast to Yule's role), our conclusion that the Employer Entities are not vicariously liable applies equally to both Ferry and Yule since, if we were to credit the worst case scenario advocated by Higazy, Yule would have joined Ferry in a deliberate deception. If, on the other hand, Yule negligently, without more, communicated information from Ferry to the FBI, there was no causal connection between Yule's negligence and Higazy's detention. Nor would such negligent transmission constitute an independent tort.

matter and not one that can be understood as redounding to or furthering the interests of his employer. Sentencing Transcript, Haesloop Decl., Ex. K at 14, 29.

Even if Ferry's testimony about his motives are discounted entirely, Higazy's vicarious liability claim cannot survive. The Employer Entities have argued that Higazy's actions in no way served to advance his employers' interests, and Higazy in response has failed to even speculate, let alone point to colorable evidence suggesting that Ferry was acting to further his employers' interests. That Ferry chose to commit a tort in the *course of* recovering abandoned guest property does not mean the tort was committed in *furtherance* of that task. *See Oliva v. City of New York,* 297 A.D.2d 789, 790, 748 N.Y.S.2d 164, 166 (2d Dep't 2002) (holding that youth counselor's alleged assault on a youth "[was] not incidental to the furtherance of [his employer's] business interests and fell outside the scope of [his] employment."). In the absence of any evidence suggesting how Ferry's actions served his employers' interests, it is appropriate to enter summary judgment in the Employer Entities favor on Higazy's vicarious liability claim.

## B. *The Employer Entities' Direct Tort Liability*

■ Higazy claims that Millennium, Hilton and CDL (the Employer Entities) are directly liable for their negligent hiring, retention, training and supervision of Ferry and Yule, and that these parties are also directly liable to Higazy for their negligence as founded on a duty of care owed to him as a hotel guest. The Employer

Entities move for summary judgment on these claims.[27]

### 1. *Negligent Hiring/Retention/Training/Supervision*

■ An employer can be liable under a theory of negligent hiring, negligent retention, negligent training, and/or negligent supervision in instances where vicarious liability for an employee's torts will not attach. *See, e.g., Estevez–Yalcin v. Children's Village,* 331 F.Supp.2d 170, 174–75 (S.D.N.Y.2004). However, this type of claim must be supported by evidence showing that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Ehrens v. Lutheran Church— Missouri Synod,* 269 F.Supp.2d 328 (S.D.N.Y.2003) (citations and quotations omitted). An employer is obligated to "investigate a prospective employee when it knows of facts that would lead a reasonably prudent person to investigate that prospective employee." *T.W. v. City of New York,* 286 A.D.2d 243, 245, 729 N.Y.S.2d 96, 97–98 (1st Dep't 2001) (holding that a "jury could reasonably conclude that [defendant] had a duty to conduct an investigation of [an employee's] background given its actual knowledge that he had a conviction, and that he would be working as a custodian in a place crowded with children"). Thus, "recovery on a negligent hiring and retention theory requires a showing that the employer was on notice of the relevant tortious propensities of the wrongdoing employee." *Estevez–Yalcin,* at 175 (quotation and citation omitted).

Prior to working at Millennium, Ferry was employed by a company called Burns

**27.** Higazy's amended complaint seeks to hold the Employer Entities liable for several intentional torts based on the actions of both Ferry and Yule. His briefing papers, however, only mention Ferry's alleged propensities and make no suggestion as to what the Employer Entities would have discovered about Yule if they had not been negligent in hiring him. The Employer Entities' motion for summary judgment against the claim of negligently hiring/retaining/supervising/training Yule is therefore granted.

Security for nearly three years. *See* Affidavit of Reynard Burgos (Human Resources Manager for Millennium) of April 1, 2004, ("Burgos Aff.") at Ex. A (verification of employment form). Before that, he was a police officer with the Newark Police Department for nearly nine years. Higazy does not claim the Employer Entities knew at any time before or during his employment with Millennium that Ferry had abused drugs and alcohol, nor has he shown that Ferry was ever subjected to disciplinary action at Millennium during the course of employment.

Higazy has presented no facts from which one could reasonably conclude that the Employer Entities knew or should have known of Ferry's substance abuse problems. The sole basis for asserting that they should have known of these habits is that several years prior to his employment at the hotel, he left the Newark Police force for personal reasons. According to Higazy, Ferry's departure from a major police force and his subsequent application for employment as a hotel security guard and the attendant salary cut should have alerted the Employer Entities to a potential problem. Higazy further contends that a reasonable investigation into Ferry's background would have revealed his drug abuse.

No reasonable jury could conclude that the Employer Entities had an obligation to investigate Ferry's background simply because he left a stressful position he held for nine years to take on a similar but less profitable job, or that such an investigation would have disclosed his drug abuse.

Moreover, the Employer Entities did conduct a verification of Ferry's work history prior to hiring, and nothing in the course of that effort revealed anything improper. Ferry is rated as uniformly "good" in the "Verification of Employment" form provided by Burns Security.[28] *See* Burgos Aff., Ex. A. Additionally, the Employer Entities obtained a letter from the Newark Police Department prior to hiring Ferry verifying his employment with the force and indicating that he resigned for personal reasons (as opposed to being fired for cause or general unfitness). Even if there was suspicion as to the "personal reasons" for resignation, nothing in Ferry's personnel record from the Newark Police Department (obtained not in advance of hiring Ferry but instead for purposes of discovery in this action) indicates drug or alcohol abuse. *See* Haesloop Decl. II, Ex. D. The file only shows that Ferry served on the Newark Police force for almost nine years, and that he resigned for personal reasons. *Id.*

Other than Millennium's failure to discover Ferry's drug problem, Higazy presents no evidence sufficient to create a triable issue as to whether the Millennium was negligent in its hiring, training, retention or supervision of Ferry. Millennium's first indication that Ferry might have a propensity to lie to his superiors or to law enforcement appears to be the very incident of which Higazy complains. This is an insufficient basis for recovering on a claim of negligent hiring, retention, training and supervision. *See Santamarina v. Citrynell,* 203 A.D.2d 57, 609 N.Y.S.2d 902 (1st Dep't 1994) (negligence in hiring/supervision/training/retention claim "cannot be inferred from the mere happening of the incident complained of."). Summary judgment on the claim is therefore granted. *See e.g., Estevez–Yalcin,* at 176.

**28.** Ferry also received strong evaluations from Millennium up until this incident. *See* Burgos Aff., Ex. A; *see also id.* ¶ C.

### 2. Negligence

 Higazy also claims the Employer Entities were negligent. Specifically, he claims that the Employer Entities, as custodians of his property, had a duty to safeguard such property in such a manner as not to permit unreasonable commingling and confusion of ownership. Plaintiff's Memorandum of Law in Opposition to [Hotel defendants'] Motion for Summary Judgment ("Plaintiff Mem.") at 22–23. Higazy claims that the failure to discharge this duty of care created an opportunity for Ferry to falsely claim the radio was found in his safe. *Id.* at 23. We reject this argument.

 Although a hotel may owe a duty to a guest to safeguard his property, Higazy does not allege loss or damage to his property, nor may he assert a breach of a duty owed to another guest. To the extent a hotel owes a broader duty to prevent confusion of ownership after an emergency evacuation, Higazy cannot establish proximate causation, which shields a defendant in a negligence suit from liability for unforeseeable injuries. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666 (1980) (holding that "[w]here the acts of a third person intervene between the defendant's conduct and the plaintiff's injury . . . . liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence"). Ferry's behavior was well beyond the ordinary or foreseeable under the circumstances and thus severed any link between the Employer Entities' inattention and Higazy's injuries. The application for summary judgment against Higazy's negligence claim is therefore granted.

### C. Yule's Tort Liability

The amended complaint asserts three common law causes of action against Stuart Yule, the Millennium's head of security and Ferry's supervisor: false arrest and false imprisonment; malicious prosecution; and intentional infliction of emotional distress.[29] To evaluate the viability of those causes of action, it is necessary to first review the evidentiary record with respect to Yule's involvement in Ferry's false statements to the FBI, noting, as appropriate, disputed and undisputed facts. Also, we note at the outset that the only directly inculpatory testimony against Yule (which Yule in fact disputes) comes from Ferry.

As is now well-known to the reader, some time in mid-October 2001, Ferry and Franco, as part of a program to collect and catalog guest property, found a radio scanner among other property in the hotel room occupied by Higazy on September 11, 2001. Upon this discovery, Yule was called to the room to look at the radio and other items that had been found in the room and safe. According to Yule, he examined the objects, determined that no further action was necessary and told Ferry and Franco to store them together with the belongings found in the room.

Ferry gave an account of the initial discovery of the radio, which contradicts Yule's version and also implicates Yule in his misdeeds, in an interview to the FBI on January 16, 2002, after the pilot had come forward to claim his radio. *See* Ward Decl. II., Ex. G. According to Ferry, Christiana Franco and another hotel employee, Pedro, were in the room when Yule came up to view the radio. Yule then told

---

**29.** Higazy also accuses Ferry of these same torts. However, Ferry took no part in the briefing of this motion, and, as we have held that the Employer Entities are not vicariously liable for Ferry's conduct, we do not address Ferry's individual liability.

Ferry to lie to the FBI about where the radio had been found in order to strengthen the case against Higazy, as they had found a "terrorist." [30] Ferry alleges that Yule reminded him on more than one occasion thereafter to maintain that the radio was found in the safe. Apparently, Ferry has not repeated this story.

It is not until after Thanksgiving, following a second report to Yule about the radio, this time by a member of a new inventory team who came across the objects again some time in late November, that Yule spoke with the FBI and mentioned the items as something of interest they might like to see. Some time thereafter the FBI, while returning other property to the hotel, examined the items and determined to obtain a search warrant for them.

Arrangements were made to call the FBI when Higazy came to the Millennium Hotel to pick up his belongings. He did so on December 17, 2001. The FBI came to the hotel and questioned him in the hotel. After Higazy denied that the radio was his or that it could possibly have been found in his safe, the agents left the room where they were questioning Higazy and asked Yule exactly where the radio had been found. Yule replied that the security guard who found the radio was nearby and contacted Ferry. Ferry told the agents on two separate occasions (most likely in Yule's presence) that evening that he found the radio in the safe.

The contemporaneous FBI reports and the statements by the FBI during the investigation following the dismissal of the case against Higazy and during depositions in this case consistently support Yule's testimony that he never told the FBI that the radio had been found in the safe.[31]

Ferry told a different story about his interaction with Yule on the location of the radio in his deposition testimony on February 11, 2004. *See* Deposition of Ronald Ferry, McShain Decl., Ex. K at 55–58. In this account, Ferry and Yule had a conversation in Yule's office sometime before Higazy returned to the hotel but after Ferry had already told the FBI that the radio had been found in the safe. Yule told Ferry that Franco told him she found the radio on the desk, contrary to Ferry's previous advice that he had found the radio in the safe. Ferry admitted that Franco was telling the truth, but Yule replied, "But I believe you." At this point, Ferry explained the importance of "stretching the truth" to strengthen a case, and Yule, according to Ferry, replied, "Only we cops understand that."

Plaintiff also cites to several other comments attributed to Yule to buttress his claims. First, speaking with the FBI after the interview of Higazy, Yule expressed the importance of the fact that the radio was found by Ferry in the safe. FBI Report of Interview with Yule on January 23, 2002, Ward Decl. II, Ex. D at 6. Second, plaintiff cites to Verde's testimony concerning Yule's reaction to his calling the FBI without waiting for Yule to tell the FBI about the pilot who came to the hotel looking for his radio. *See* supra footnote 16. Yule described this conversation differently. *See* Deposition of Stuart Yule, Haesloop Decl., Ex. B. at 109. Third, there is Yule's comment to Agent

---

**30.** We note the conspicuous omission in the record of testimony by or interview of either Franco or Pedro.

**31.** In fact, Yule says that the first time he learned that the radio was found in the safe was when the FBI spoke with Ferry on December 17, 2001 during Higazy's interview. Deposition of Stuart Yule, Haesloop Decl., Ex. B. at 88.

Bruno after it became clear that the radio had not been found in Higazy's safe about how they could "spin" this, suggesting that maybe it could be blamed on the safe company. Report of Agent Bruno dated January 20, 2002, Ward Decl., Ex. I.

 We recognize that although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when ruling on a summary judgment motion, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, implausible evidence that a reasonable person would not believe may be disregarded. *See, e.g., Sedney v. Hasse,* No. 02 Civ. 2583, 2003 WL 21939702 (S.D.N.Y.Aug.12, 2003); *Jeffreys v. P.O. Rossi,* 275 F.Supp.2d 463 (S.D.N.Y.2003) (noting that "a party cannot rely upon implausible testimony to create a triable issue of fact"). *See also Schneider v. OG & C Corp.,* 684 F.Supp. 1269, 1274 (S.D.N.Y.1988) (passing on credibility of evidence on summary judgment is acceptable if tendered evidence is "too incredible to be accepted by reasonable minds").

This approach has applicability here at least with respect to the first story that Ferry told about Yule's proposal allegedly made when the radio was initially found, on or about October 11, 2001. According to Ferry, Yule suggested that they lie to the FBI and claim that the radio had been found in a safe to strengthen the case since they had found a "terrorist." There are at least three reasons why this story is simply incredible. First, it is totally inconsistent with the undisputed record of Yule's subsequent actions, namely, that he did not report the finding of the radio to the FBI until after Thanksgiving and according to the FBI never told them that it was found in the safe. Second, there is

the fact that Ferry never repeated, and indeed changed, his story, as well as the broader issues of Ferry's credibility. Third, it strains credibility that the head of Hotel Security would announce in front of three lower level hotel employees his intent to commit a crime.[32]

Nonetheless, we will proceed (despite out admitted skepticism) on the premise that there is a genuine issue of fact raised by Ferry's second version of Yule's complicity in his repeated lies to the FBI, and assume for the required legal analysis of the common law claims that Ferry and Yule reached an agreement following Ferry's initial statement to the FBI that he had found the radio in the safe. That agreement essentially was that Yule would not contradict Ferry's statement that the radio was found in the safe, which he either knew or suspected was false.

### 1. *False Arrest and False Imprisonment*

 Under New York law, no distinction is drawn between false arrest and false imprisonment. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991) (*citing Jacques v. Sears, Roebuck & Co.,* 30 N.Y.2d 466, 472–73, 334 N.Y.S.2d 632, 638, 285 N.E.2d 871 (1972)); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). To establish false arrest or false imprisonment, the plaintiff must demonstrate that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Boose v. City of Rochester,* 71 A.D.2d 59, 64, 421 N.Y.S.2d 740, 745 (4th Dep't 1979) (citations omitted).

---

**32.** We note that Yule, unlike Ferry, was never prosecuted. In making this observation, we recognize that the burden of proof is greater in the criminal context.

■ The issue presented here concerns the first element. "To prove intent, the defendant must have either: (1) confined or intended to confine plaintiffs, or (2) affirmatively procured or instigated the plaintiff's arrest." *King v. Crossland Sav. Bank,* 111 F.3d 251, 256 (2d Cir.1997) (citations omitted). However, it is well settled that "a civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest." *Du Chateau v. Metro–North Commuter R.R. Co.,* 253 A.D.2d 128, 131, 688 N.Y.S.2d 12, 15 (1st Dep't 1999). In evaluating a false arrest claim, as the state cases cited in *King* demonstrate, courts consider whether deliberately false information or withholding of information occurred or whether the defendant acted with "malice" in determining whether the reports to law enforcement are actionable.

As our review of the facts related to Yule establishes, there is an issue, however dubious, as to Yule's participation in Ferry's misstatements to the FBI. Under these circumstances, Yule's motion for summary judgment is denied.

### 2. *Malicious Prosecution*

■ Higazy also claims that Yule maliciously prosecuted him by providing false information to law enforcement. Under New York law, to prevail on a malicious prosecution claim, a plaintiff must show (1) the initiation or continuation of a criminal proceeding by the defendant against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) the lack of probable cause for commencing the proceeding; and (4) actual malice as the motivation for defendant's actions. *See Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir.1994); *Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248 (1983). Yule moves for summary judgment on Higazy's malicious prosecution claim, contending that Higazy cannot establish any of the factors with respect to Yule except the second (termination of the proceeding in plaintiff's favor).

■ Regarding initiation of the proceeding, the Hotel defendants argue that Yule only provided law enforcement with misinformation as to where the radio was found but that law enforcement made its own decision to arrest and detain Higazy.[33] It is well-established that merely "reporting a crime to law enforcement and giving testimony" does not constitute "initiation" of a criminal proceeding. *See Rothstein v. Carriere,* 373 F.3d 275, 293 (2d Cir.2004). As the Second Circuit recently held, "more is required" than simply imparting even false information on authorities. *Id.* at 294. Specifically, "the complainant must have played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Id.* (citations and quotations omitted).

As the evidentiary review at the outset of this section establishes, Yule did not himself inform the FBI that the radio was found in the safe. Viewing the facts in the

---

**33.** Interestingly, the Hotel defendants do not challenge Higazy's claim on the basis that the only "prosecution" against Higazy was the criminal complaint filed against him on January 11, 2002 charging him with making false statements. Instead, the Hotel defendants assume that being arrested pursuant to § 3144 (the material witness statute) constitutes prosecution for purposes of this tort. Because the Hotel defendants do not seek to defeat Higazy's claim on this ground (and because neither party has had the opportunity to brief this question), this issue will not be addressed.

light most favorable to Higazy, Yule supported Ferry's decision to lie to the investigators and declined to correct the resulting false impression. However, Yule did not advise, encourage, or importune the authorities to arrest and detain Higazy. Yule is therefore entitled to summary judgment on Higazy's claim of malicious prosecution.

### 3. *Intentional Infliction of Emotional Distress*

■ The Hotel defendants move for summary judgment on Higazy's claim that Yule's actions were an intentional infliction of emotional distress.

■ New York recognizes the tort of intentional infliction of emotional distress, *see Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993), and requires the following four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress. Defendants chiefly dispute whether Higazy has established the requisite outrageousness.

■ In order for behavior to qualify as "extreme and outrageous," it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kaminski v. United Parcel Service*, 120 A.D.2d 409, 412, 501 N.Y.S.2d 871 (N.Y.App.Div., 1986) (internal citations omitted). While we in no way wish to minimize the wrongfulness of Ferry's conduct, once again, based on the evidentiary record and focusing on defendant Yule, we find that Yule's conduct falls far short of that which qualifies as extreme and outrageous. *Cf. Kurschus v. PaineWebber, Inc.*, 16 F.Supp.2d 386, 395 (S.D.N.Y.1998) (denying summary judgment on "outrageous conduct" issue where, when plaintiff refused to resign his job, defendants allegedly made false accusations that plaintiff raped one of the defendants to the police, who arrested him, and to plaintiff's wife, who divorced him). Finally, we note that the established torts of false arrest, false imprisonment, and malicious prosecution [34] create an ample legal framework to address the facts of this case. Yule's motion for summary judgment against this claim is accordingly granted.

### *CONCLUSION*

For the foregoing reasons, we grant Templeton's motion and the Hotel defendants' motion with the exception of defendant Yule's motion, which we grant except with respect to the claim of false arrest.

IT IS SO ORDERED.

---

**34.** Further, we note that the Second Circuit has recently held that "[i]f the criminal prosecution was otherwise supported by probable cause, for example, the malicious prosecution claim is unavailable, even if the accuser lied." *Rothstein v. Carriere*, 373 F.3d 275, 295 (2d Cir.2004).