05-4148-cv
Higazy v. Millenium Hotel and Resorts

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2005

(Argued: June 23, 2006                    Decided: October 19, 2007)

Docket No. 05-4148-cv

_____

ABDALLAH HIGAZY,

　　　Plaintiff-Appellant,

　　v.

FBI AGENT MICHAEL TEMPLETON,

　　　Defendant-Cross-Claimant-Cross-
　　　Defendant-Appellee,


MILLENIUM[1] HOTEL AND RESORTS,
THE HILTON HOTELS AND CORPORATION,
RONALD FERRY, STUART YULE,

　　　Defendants-Cross-Claimants-
　　　Cross-Defendants.


_____

_____

　　　[1]  We use the spelling of the official caption, although the papers before the court are not consistent with respect to the spelling of the hotel's name.

1

Before: JACOBS, Chief Judge, POOLER, Circuit Judges, KOELTL, District Judge.[2] Chief

Judge Jacobs concurs in the judgment of the Court and files a separate concurring opinion.

Plaintiff-appellant Abdallah Higazy appeals from the June 29, 2005 judgment of the

United States District Court for the Southern District of New York (Buchwald, J.) in so far as it

dismissed his claims against Defendant-Cross-Claimant-Cross-Defendant-Appellee Michael

Templeton. See Higazy v. Millennium Hotel & Resorts, 346 F. Supp. 2d 430 (S.D.N.Y. 2004).

Higazy has properly alleged a deprivation of his Fifth Amendment right against compulsory self-

incrimination, as to his bail hearing on January 11, 2002, by which time a criminal complaint had

been filed against him and he was subject to detention on that complaint.

AFFIRMED in part, VACATED in part, and REMANDED.

_____

JONATHAN ABADY, Emery Celli Brinckerhoff & Abady LLP (O. Andrew F. Wilson, of Emery Celli Brinckerhoff & Abady LLP, Earl Ward, on the brief) New York, NY, for Appellant,

SEAN LANE, Assistant United States Attorney (Heather McShain and Sean Cenawood, Assistant United States Attorneys, Michael Garcia, United States Attorney for the Southern District of New York, on the brief) New York, NY, for Appellee.

_____

POOLER, Circuit Judge.

Plaintiff-appellant Abdallah Higazy ("Higazy") filed an amended complaint on December

12, 2002, in the United States District Court for the Southern District of New York (Buchwald,

J.), against FBI Special Agent Michael Templeton ("Templeton"), the Millenium Hotel

_____

[2] The Honorable John G. Koeltl, United States District Court for the Southern District of New York, sitting by designation.

("Millenium"), Millenium's corporate owner CDL (New York), LLC, Millenium's corporate operator Hilton Hotels Corp. ("Hilton"), and Millenium employees Stuart Yule ("Yule") and Ronald Ferry ("Ferry"). Every defendant except Ferry moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. On September 30, 2004, the district court granted summary judgment for defendants, except on the claim against Yule, where summary judgment was denied in part and granted in part. See Higazy v. Millennium Hotel & Resorts, 346 F. Supp. 2d 430 (S.D.N.Y. 2004). On May 4, 2005, Higazy's remaining claims against the hotel defendants were dismissed with prejudice when the parties reached a settlement agreement, memorialized in a stipulation and order. Judgment was entered on June 29, 2005, dismissing Higazy's claims against Templeton pursuant to the September 30, 2004 memorandum and order, and dismissing the claims against the remaining defendants, pursuant to the parties' May 4, 2005 stipulation and order. Higazy appeals from this judgment, excluding the parties' stipulation and order. Because the district court improperly dismissed part of Higazy's Fifth Amendment claim, we affirm in part, vacate in part, and remand the case to the district court for further proceedings.

## BACKGROUND

Higazy is a citizen of Egypt. His father once served as a diplomat in Washington, D.C., and Higazy received part of his high school and elementary school education in Virginia. Higazy arrived in New York from Cairo in late August 2001, to study computer engineering at Polytechnic University in Brooklyn, New York. His studies were sponsored by the United States Agency for International Development and the Institute for International Education. These

3

institutions arranged for him to stay at the Millenium Hotel, which was across the street from the World Trade Center ("the Center"), in New York City.

On September 11, 2001, Higazy awoke in a corner room on the fifty-first floor of the hotel.[3] The first hijacked airliner hit the Center at 8:46 a.m., approximately forty-five minutes after Higazy awoke, and while he was still in his room. After the second plane hit the second tower, at 9:03 a.m., Higazy was evacuated with the other hotel guests. Higazy left most of his belongings in the hotel room, taking only one hundred dollars in cash, his wallet, and the clothing he was wearing.

In late September or early October, hotel employees, including Yule, Millenium's chief security officer, and Ferry, a Millenium security employee, instituted a plan for retrieving and inventorying guest property. On October 11, 2001, Ferry retrieved a radio, which he said he had found in room 5101. Ferry told Yule that a passport, yellow medallion, and Koran were found with the radio in the room's safe. In late November, another hotel employee was performing a second inventory of guest property and brought the radio to Yule's attention. This time, Yule found the circumstances to be "sinister" and called the FBI to tell them that he had found "something of interest they should see." Higazy, 346 F. Supp. 2d at 438. FBI agents Vincent Sullivan ("Sullivan") and Christopher Bruno ("Bruno") came to examine the radio, which they determined was an air-band transceiver capable of air-to-air and air-to-ground communication.

On December 17, 2001, Higazy returned to the hotel to pick up his belongings. He went in the morning because he had a university final examination that afternoon. He was approached

---

[3] There was debate in the briefs submitted to the district court as to which room Higazy was occupying, see Higazy, 346 F. Supp. 2d at 438 n.5, which we need not resolve here.

4

by three FBI agents: Sullivan, Bruno, and Adam Suits ("Suits"). The three agents had been told that Higazy would be coming. The agents asked Higazy about the radio, and Higazy told them that it was not his. When the agents told him that the radio was found in his room's safe, he replied, "[T]hat's impossible." Higazy initially told the agents that he had never seen a radio like this one before, but he later told the agents that he was once a lieutenant in the Egyptian Air Force and had knowledge of radio communications. The FBI questioned Ferry twice while Higazy was being interviewed. Each time, Ferry asserted that he found the radio in the safe on top of the passport. At the end of the interview, the FBI detained Higazy as a material witness, pursuant to the federal material witness statute. See 18 U.S.C. § 3144. Higazy later explained that he was worried about the effect this could have on his scholarship: "I remember amongst the things that I told the scholarships people, 'I apologize. I've been arrested. I'm going to miss my final exam today.' I just want to put that on record. And I remember the detective looking at me and saying, 'You're being arrested as a material witness for 9/11 and the only thing you're worried about is missing your final exam?' I said, 'Yes.'"

Higazy was taken from the hotel to the FBI building, where he was, in his words, "in shock, in disbelief." Higazy voluntarily waived his right to counsel, spoke with agents, and then changed his mind and asked for an attorney. The interrogation stopped. Higazy spent the night of December 17, 2001, in detention. Because of the contradiction between what Higazy said and what the hotel employees told the FBI, Bruno swore out an affidavit where he concluded that Higazy might have given false statements to federal law enforcement agents. Bruno completed the affidavit, dated December 18, 2001, in support of a material witness warrant, "so that [Higazy] may be produced for testimony before a grand jury in the Southern District of New

5

York." According to this affidavit, the grand jury was "investigating various felony offenses, including, among others, the destruction of and conspiracy to destroy aircraft (18 U.S.C. § 32); bombing and bombing conspiracy (18 U.S.C. § 844); racketeering and racketeering conspiracy (18 U.S.C. § 1962); and seditious conspiracy to levy war against the United States (18 U.S.C. § 2384)."

Later that day, Higazy was brought before the United States District Court for the Southern District of New York (Rakoff, J.), on Bruno's material witness warrant. This warrant alleged that Higazy was a witness who might have information related to the terrorist attacks of September 11. Judge Rakoff summarized the government's theory: "the suggestion that the government is making is based on the fact that a cooperating witness, based on other Al Qaeda activities, suggests that the hijackers may have placed a beacon or other device in the form of this transceiver in or near the World Trade Center in advance of an attack to help direct the pilots to their targets." Higazy's attorney told the court that Higazy denied owning the radio and was "urgently desirous of taking a lie detector test." Judge Rakoff noted, with regard to the subject of bail, "I want to reemphasize that this is not perhaps the most overwhelming showing on the part of the government," but he decided that "the witness will be detained through, but on the present showing not beyond, December 28." Judge Rakoff scheduled another hearing on December 28 "to see where things stand." Judge Rakoff also said, "[t]he government clearly is suggesting that it might have further applications to make on the 28th, but it is representing, as I understand it, its expectation that the witness would be presented to the grand jury before the close of business on the 28th. Is that right?" The government replied: "[t]he witness will be presented — it is our expectation that that will happen."

The government expressed its doubt that a polygraph of Higazy would be useful and opposed Higazy's request to take one. They explained that if Higazy was a member of al Qaeda, he could pass it. Nevertheless, on December 27, Templeton—who up until this point was not involved in the investigation—conducted a polygraph examination of Higazy. Templeton began the test by asking Higazy background questions on subjects such as Higazy's scholarship, homeland, family in Egypt, brother in upstate New York, and girlfriend. He also asked Higazy whether he had anything to do with the attacks of September 11, 2001. The first round of testing allegedly suggested that Higazy's answers to the questions relating to the September 11 attacks were deceptive. As the second series of questioning was ending, Higazy requested that Templeton stop. He testified that he began "feeling intense pain in my arm. I remember hearing my heartbeat in my head and I just couldn't breathe. I said, 'Sir, sir, please, stop. It hurts. Please stop. Please take it off.'" Templeton unhooked the polygraph, and according to Higazy, called Higazy a baby and told him that a nine-year-old could tolerate this pain. Templeton left the room to get Higazy water, and upon his return, Higazy asked whether anybody else had ever suffered physical pain during the polygraph, to which Templeton replied: "[i]t never happened to anyone who told the truth."

Higazy alleges that during the polygraph, Templeton told him that he should cooperate . . . .

This opinion has been redacted because portions of the record are under seal. For the purposes of the summary judgment motion, Templeton did not contest that Higazy's statements were coerced.

Higazy then gave Templeton a series of explanations as to how he obtained the radio. First, he admitted that he stole the radio from J&R, an electronics store. Then he recanted this story, and explained that he found it near J&R. Higazy next denied ever seeing or possessing the radio. Templeton allegedly banged on the table and screamed at Higazy: "You lied to me again! This is what? How many lies?" Higazy then lied again, this time telling Templeton that he found the radio on the other side of the Brooklyn Bridge. Higazy recalled that Templeton "turned so red I thought he was going to hit me." Templeton accused Higazy of being a liar, and said that he would "tell Agent Sullivan in my expert opinion you are a terrorist." Finally, Higazy told Templeton that he had stolen the radio from the Egyptian military and had used it to eavesdrop on telephone conversations.

Templeton then wrote out a statement providing that Higazy had stolen the radio from the Egyptian military, which he asked Higazy to sign. Higazy remembered that his attorney was outside, and asked to see his attorney. At first, Higazy's attorney was angry with Higazy, thinking Higazy had lied to him, but when Higazy told his attorney that he had not lied to him, the attorney advised Higazy not to sign the statement.

The parties appeared the following day, December 28, 2001, for the previously scheduled hearing before Judge Rakoff. At the hearing, the government proffered its "new evidence," apparently the information gained during the polygraph interview: "[Higazy] has admitted it is his radio, and he has provided I believe about three different versions of where it came from." Judge Rakoff commented, "it no longer strikes me as even an arguably close call whether to detain him, given the apparent unreliability or inconsistency between what was previously represented and what I am now being advised is the situation." The parties agreed to adjourn the

8

bail hearing; Higazy's attorney did not object to the government's request that bail be denied and Higazy be further detained. Judge Rakoff ordered Higazy detained and instructed the parties to appear before him on January 14, 2002.

On January 11, 2002, Agent Bruno filed a criminal complaint against Higazy for making false statements, in violation of 18 U.S.C. §1001(a). Higazy was brought before the United States District Court for the Southern District of New York (Maas, <u>M.J.</u>), where the government implied that Higazy's false statements were somehow connected to the investigation of the September 11 terrorist attacks: "[t]he crime that was being investigated when these false statements were repeatedly made I think can fairly be characterized as perhaps the most serious in our country's history." In its bail argument, the government alluded to Higazy's "three different versions of how he had come into possession of the radio," and concluded that Higazy "is not somebody who can be deemed trustworthy." Magistrate Judge Maas ordered Higazy to be detained and held without bail.

Three days later, on January 14, 2002, an airline pilot, who had been staying on the 50th floor of the Millenium Hotel returned to the hotel to reclaim his property. After inspecting his items, the pilot informed the hotel staff that his transceiver was missing. Millenium immediately contacted the FBI, which then verified that what was thought to be Higazy's transceiver was in fact the pilot's and that the pilot had not had any interaction with Higazy. The FBI re-interviewed Ferry, who revised his original account, this time explaining that the radio was found on a table in Higazy's room and not in the safe. The government withdrew its complaint against Higazy, who was released on January 16, 2002, after thirty-four days in custody. In a letter to Judge Maas, the government conceded:

The owner of the aviation radio had no interaction with Mr. Higazy. It is still unclear, therefore, how the radio was transferred from the room on the 50th Floor to Mr. Higazy's room on the 51st floor. Employees of the hotel have indicated that, although the hotel has been closed since September 11th, a number of people entered the room in which Mr. Higazy had been staying at different times between September 11th and the day on which the radio was found.

On March 18, 2002, Judge Rakoff convened a hearing to inquire into the parties' representations to him regarding Higazy's confession. See In re Material Witness Warrant, 214 F. Supp. 2d 356 (S.D.N.Y. 2002). Judge Rakoff explained that he felt he had been "misled" twice. In an opinion and order, he wrote:

[T]he Court was not willing to simply go-along with the uncontested request for a further detention of Higazy but, instead, demanded further information regarding what had previously seemed a close call, and in the process was materially misled by being informed of a confession that subsequently was shown to be false.

In re Material Witness Warrant, 214 F. Supp. 2d at 362. Judge Rakoff asked for a government inquiry into the Higazy affair.[4]

On December 12, 2002, Higazy filed an eight-count complaint against Templeton and the hotel defendants. Higazy's claims against Templeton were brought pursuant to Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971). After discovery, all defendants but Ferry moved (Templeton in a separate motion) for summary judgment.[5] The

---

[4] The government later filed an information against Ferry, accusing him of lying to government agents in the course of their investigation of the radio. On May 30, 2002, Ferry pleaded guilty and was sentenced to three years probation and six months of intermittent confinement on weekends. See United States v. Ferry, 02 Cr. 221 (GBD). No additional indictments or complaints were filed against any other hotel employee.

[5] In his motion for summary judgment, Templeton made two arguments: (1) he was entitled to qualified immunity because the constitutional rights Higazy sought to vindicate were not violated and were not clearly established at that time; and (2) Higazy could not establish a causal link between the alleged harm and Templeton's conduct.

district court issued a memorandum and order on September 30, 2004, granting, inter alia, Templeton's motion to dismiss Higazy's Fourth, Fifth, and Sixth Amendment claims.[6] See Higazy, 346 F. Supp. 2d at 436. The district court dismissed Higazy's Fifth Amendment self-incrimination claim, concluding that Templeton was entitled to qualified immunity. The district court dismissed Higazy's Fifth Amendment due process claim because "Templeton's conduct and threats as a matter of law cannot be classified as conscience-shocking or constitutionally oppressive. Templeton's alleged threats, whether intended to coax a confession or arbitrarily frighten, may be the subject of proper criticism, but they are not actionable under the Fifth Amendment's due process clause." Id. at 451.[7] The district court also dismissed Higazy's Sixth Amendment claim: "Higazy's Sixth Amendment claim fails at the threshold . . . . Higazy does not present the Court with any case in which a plaintiff successfully raised a Bivens or § 1983 action to redress the deprivation of counsel (under either the Fifth or Sixth Amendment) in the abstract." Id. (footnote omitted). Final judgment was entered on June 29, 2005.

## DISCUSSION

On appeal, Higazy argues that (I) the district court erred in granting summary judgment on his Fifth Amendment self-incrimination claim because (a) Templeton was not entitled to

---

[6] On May 4, 2005, Higazy's claims against the hotel defendants were dismissed with prejudice when the parties reached a settlement agreement, memorialized in a stipulation and order.

[7] Higazy appeals only the denial of his Fifth Amendment self-incrimination and Sixth Amendment claims. An argument or an issue that is not raised in the appellate brief may be considered abandoned. LoSacco v. City of Middletown, 71 F.3d 88, 92–93 (2d Cir. 1995). Because Higazy appeals only the denial of his Fifth and Sixth Amendment claims, we limit our discussion of the district court's decision to those parts relevant to this appeal.

11

qualified immunity, and (b) Templeton's conduct was a proximate cause of the use of Higazy's allegedly coerced statements and Higazy's resulting detention; and (II) the district court erred in granting summary judgment on his Sixth Amendment claim because (a) Higazy's Sixth Amendment claim can be pleaded in the alternative to his Fifth Amendment claim, and (b) Templeton was not entitled to qualified immunity.

This Court reviews de novo the granting of summary judgment by a district court. Pepsico, Inc. v. Coca-Cola Co., 315 F.3d 101, 104 (2d Cir. 2002). Summary judgment is appropriate only where, "[e]xamining the evidence in the light most favorable to the nonmoving party," Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 547 (2d Cir. 1998), the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c). A motion for summary judgment must be rejected "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted).

A Bivens action is a judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights. Ellis v. Blum, 643 F.2d 68, 84 (2d Cir. 1981). "Bivens established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." Carlson v. Green, 446 U.S. 14, 18

12

(1980). The only remedy available in a <u>Bivens</u> action is an award for monetary damages from defendants in their individual capacities. <u>See</u> <u>Polanco v. U.S. Drug Enforcement Admin.</u>, 158 F.3d 647, 652 (2d Cir. 1998).

I. H<small>IGAZY'S</small> F<small>IFTH</small> A<small>MENDMENT</small> C<small>LAIM</small>

A. Qualified immunity

Qualified immunity shields government officials from civil suits for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).[8] We have explained:

> In determining whether a particular right was clearly established at the time defendants acted, this Court has considered three factors: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

<u>Jermosen v. Smith</u>, 945 F.2d 547, 550 (2d Cir. 1991). As the third part of the test provides, even where the law is "clearly established" and the scope of an official's permissible conduct is

---

[8] To rule on the issue of qualified immunity, this Court generally proceeds in two steps. First, this Court must address the threshold question of whether the amended complaint alleges the deprivation of an actual constitutional right. <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999). The Supreme Court has explained that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). A right is sufficiently clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id</u>. at 202.

13

"clearly defined," the qualified immunity defense also protects an official if it was "objectively reasonable" for him at the time of the challenged action to believe his acts were lawful. Anderson v. Creighton, 483 U.S. 635, 641 (1987) (explaining Harlow, 457 U.S. at 800); see also Robison v. Via, 821 F.2d 913, 920–21 (2d Cir. 1987).

> The matter of whether a right was clearly established at the pertinent time is a question of law. In contrast, the matter of whether a defendant official's conduct was objectively reasonable, i.e., whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact.

Kerman v. City of New York, 374 F.3d 93, 108–09 (2d Cir. 2004) (citations omitted). Moreover, "[a]lthough a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual questions must be resolved by the factfinder." Id. at 109 (citations omitted). "Though 'immunity ordinarily should be decided by the court,' that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required . . . ." Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991)).

**I. Did Higazy allege a violation of an actual constitutional right?**

Reviewing this question de novo, we hold that Higazy has properly alleged an actual deprivation of his Fifth Amendment constitutional right against compulsory self-incrimination only as to the second bail hearing, which took place on January 11, 2002.[9]

_____

[9] The specific issue we address here is the existence of a genuine issue of material fact as to whether Higazy was deprived of an actual constitutional right. As we discuss in greater detail below, to allege a deprivation of the Fifth Amendment right against self-incrimination, Higazy must allege not only that the confession was coerced, but that it was used against him in a criminal case. While we conclude here that Higazy's allegedly coerced statements were used in a

14

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. "It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v. United States, 406 U.S. 441, 444–45 (1972) (footnotes omitted). In Kastigar, the Supreme Court declared that the Amendment's "sole concern is to afford protection against being forced to give testimony leading to the infliction of [criminal] penalties." Id. at 453 (internal quotation marks and citation omitted). The Fifth Amendment's self-incrimination clause bars the government from using a compelled confession in any criminal case.

The test for whether a statement was improperly obtained by coercion is "determined by the totality of the circumstances." Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998). In order to decide the summary judgment motion, and only for that purpose, the district court assumed that Higazy's confession had been coerced. Higazy, 346 F. Supp. 2d at 447 n.20. Because Templeton's motion for summary judgment did not challenge the sufficiency of Higazy's allegation that his statements were coerced, see id., the issue of coercion (or not) is not before us, and we too assume that the statements were coerced.

In Weaver v. Brenner, 40 F.3d 527 (2d Cir. 1994), we concluded that a coerced statement did not have to be introduced at trial to violate a plaintiff's Fifth Amendment rights. We held

_____

criminal case, this is different from the issues of whether Templeton caused the statements to be used at Higazy's hearing and whether Templeton's actions were a proximate cause of Higazy's detention, both of which we conclude raise genuine issues of material fact that should be decided by the fact finder.

15

"that use or derivative use of a compelled statement at <u>any</u> criminal proceeding against the declarant violates that person's Fifth Amendment rights; use of the statement at trial is not required." <u>Id.</u> at 535 (emphasis in original). We concluded that the use of a coerced confession before a grand jury was a violation of the self-incrimination clause: "The use of a coerced confession before a grand jury plainly makes the [person who gave the statement] a witness against himself in a criminal case, one leading to the infliction of criminal penalties against him. Such use, if the confession is found to have been coerced, violates [the declarant's] constitutional rights . . . ." <u>Id.</u> at 536.

The Supreme Court more recently discussed the meaning of the Amendment's phrase, "in any criminal case," in <u>Chavez v. Martinez</u>, 538 U.S. 760 (2003). The Supreme Court concluded that an officer could not be subjected to civil liability for an alleged violation of the privilege against compelled self-incrimination where the coerced statement is not thereafter used against the person who gave the statement. In his plurality opinion, Justice Thomas explained that "mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness." <u>Id</u>. at 769. Thus, while the privilege may be invoked in any proceeding, a violation of the constitutional right "occurs only if one has been compelled to be a witness against himself in a criminal case." <u>Id</u>. at 770. In <u>Chavez</u>, Justice Thomas concluded in his plurality opinion that "a 'criminal case' at the very least requires the initiation of legal proceedings." <u>Id</u>. at 766. Justice Thomas quoted <u>Blyew v. United States</u>, 80 U.S. 581, 595 (1872), which explained that "[t]he words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning a proceeding in court, a suit, or action," and <u>Black's Law Dictionary</u> 215 (6th ed. 1990), which defined "case" as "[a] general

16

term for an action, cause, suit, or controversy at law . . . a question contested before a court of justice." 538 U.S. at 766. Declining to decide "the precise moment when a 'criminal case' commences," Justice Thomas wrote that "it is enough to say that police questioning does not constitute a 'case' any more than a private investigator's precomplaint activities constitute a 'civil case.'" Id. at 767. However, Justice Thomas did explain, "it is not until [statements compelled by a police interrogation are used] in a criminal case that a violation of the Self-Incrimination Clause occurs." Id. at 767.[10] Justice Souter concurred in an opinion joined by Justice Breyer and concluded that it was unnecessary to expand the privilege against self-incrimination to include a claim for civil liability against an officer who took a coerced statement when that statement was not used against the person claiming the privilege. Id. at 779. Justice Souter did not attempt to define when a criminal case commenced for the purpose of determining when a statement is used in a criminal case against a person.

By the time of Higazy's January 11, 2002 bail hearing, a criminal complaint had been filed against him and he was subject to detention on that complaint.[11] The proceeding was an

---

[10]   Justice Thomas cited United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990), for this proposition. The Court in Verdugo-Urquidez had actually indicated that a violation of the self-incrimination clause "occurs only at trial." Id. But Verdugo-Urquidez was in fact dealing with a violation of the Fourth Amendment and it is clear that Justice Thomas did not read it as limiting the application of the self-incrimination clause to statements that were introduced at trial rather than in other parts of a "criminal case." Similarly, Justice Kennedy, who wrote a concurring and dissenting opinion in Chavez, and who would have found that a violation of the self-incrimination clause is complete when a coerced confession is taken, did not find that Verdugo-Urquidez required the use of a coerced statement at trial to complete a violation of the self-incrimination clause. See Chavez, 538 U.S. at 792 (Kennedy, J., concurring in part and dissenting in part).

[11] The district court and the parties refer to the proceeding before Judge Maas as an arraignment. However, an arraignment occurs after an indictment or information has been filed. See Fed. R. Crim. P. 10. The bail hearing before Judge Maas was part of an initial appearance by

17

initial appearance on the criminal complaint, and the determination of bail was part of that proceeding. The proceeding was governed by the Federal Rules of Criminal Procedure.[12] In Mitchell v. United States, 526 U.S. 314, 327 (1999), the Supreme Court held that the protection against self-incrimination applies to the sentencing phase of a criminal trial. There, Justice Kennedy wrote, "[t]o maintain that sentencing proceedings are not part of 'any criminal case' is contrary to the law and to common sense." Id. at 327. Although Justice Kennedy was discussing sentencing, there are several reasons why a bail hearing is a "proceeding in court," as the Supreme Court in Chavez defined "case" when it quoted Black's Law Dictionary ("general term for an action, cause, suit, or controversy at law . . . a question contested before a court of justice."). See 588 U.S. at 766–67.[13]

The status of bail hearings under other constitutional provisions supports the conclusion that such a hearing is part of a criminal case against an individual against whom charges are pending. In the Sixth Amendment context, the Supreme Court found that a bail hearing is a "critical stage of the State's criminal process at which the accused is as much entitled to such aid

_____

the defendant on a criminal complaint. The complaint was signed by Special Agent Bruno before Judge Maas. The procedures for an initial appearances are governed by Rule 5 of the Federal Rules of Criminal Procedure, which includes guidance on what to tell the defendant about his rights, the charge(s) against him, and the available means of securing pretrial release. See Fed. R. Cr. P. 5(d).

[12] As for the December 28, 2001, bail hearing we need not decide whether Higazy has properly alleged an actual deprivation of his Fifth Amendment right because we hold that it was not clearly established in December 2001 that a bail hearing in a material witness proceeding was, for Fifth Amendment purposes, a criminal case. We disagree that Noto v. United States, 76 S. Ct. 255 (1955), established the right in question.

[13] The Federal Rules of Criminal Procedure, which are "intended to provide for the just determination of every criminal proceeding," Fed. R. Crim. P. 2, make specific provisions for bail proceedings. See Fed. R. Crim. P. 46(a).

18

(of counsel) . . . as at the trial itself." Coleman v. Alabama, 399 U.S. 1, 9–10 (1970) (internal

quotation marks and citation omitted; ellipsis in original). The Court followed this logic when

discussing the Eight Amendment, in Stack v. Boyle, 342 U.S. 1, 6–7 (1951), where it also treated

a bail hearing as "a criminal proceeding." This accords with our case law on bail hearings. In

United States v. Abuhamra, 389 F.3d 309, 323 (2d Cir. 2004), we wrote that "[b]ail hearings fit

comfortably within the sphere of adversarial proceedings closely related to trial." There, we

explained that:

> [B]ail hearings, like probable cause and suppression hearings, are frequently hotly contested and require a court's careful consideration of a host of facts about the defendant and the crimes charged . . . . Bail hearings do not determine simply whether certain evidence may be used against a defendant at trial or whether certain persons will serve as trial jurors; bail hearings determine whether a defendant will be allowed to retain, or forced to surrender, his liberty during the pendency of his criminal case.

Id. at 323–24. The issue there was whether ex parte evidence could be used against a defendant

in a bail proceeding. We held, "neither the defendant nor the public would be well served by

having determinations that so immediately affect even this reduced interest routinely made in

closed proceedings or on secret evidence." Id. at 324.

Based on our prior rulings on the Fifth Amendment and bail hearings, and Justice

Thomas's definition of "criminal case" in Chavez, which illuminates the cases decided before

January 2002, on which we may rely, we hold that Higazy's initial appearance on January 11,

2002, which included the determination of whether he would be detained or released on bail, was

part of the criminal case against Higazy.

**ii. Was the constitutional right clearly established as of December 2001?**

In December 2001 and January 2002, the Fifth Amendment right that Higazy claims with respect to the January 11, 2002 bail hearing was defined with "reasonable specificity" and supported by Second Circuit case law. It was clearly established in December 2001 and January 2002 that a coerced confession could not constitutionally be used against a defendant in a criminal case, and it was clearly established that a bail hearing, after criminal charges had been filed, was part of a criminal case. This is a question of law, which we review de novo. See Kerman, 374 F.3d at 93.

In Weaver, we addressed a very similar issue to the one we face here, and explained: "Appellants contend that the coerced statement must be introduced at the individual's trial before the [Fifth] Amendment is violated. We disagree." 40 F.3d at 535. We ultimately concluded, as noted above: "As a consequence, we hold that the use or the derivative use of a compelled statement at any criminal proceeding against the declarant violates that person's Fifth Amendment rights; use of the statement at trial is not required." Id. Significantly, we found that this right was sufficiently well established at the time of the alleged violation to satisfy the first prong of the qualified immunity analysis.[14]

On January 11, 2002, it was clearly established that the FBI could not coerce a confession and later use that confession in a criminal case, including in a proceeding before a judge after criminal charges had been filed, to impose the penalty of continued detention. The

---

[14] United States v. Awadallah, 349 F.3d 42 (2d Cir. 2003) (holding that the federal material witness statute can be applied constitutionally to a grand jury witness) is not relevant to this case, because it dealt solely with whether a material witness could be held for grand jury testimony, not whether a bail proceeding—per se or as part of a material witness proceeding—was a criminal case for the purposes of the Fifth Amendment's self-incrimination clause.

20

government argues that there was conflicting Supreme Court law as to whether a Fifth Amendment right against self-incrimination was only a trial right, or extended more broadly. We disagree.

Chavez rejected the proposition that there is a completed violation of the self-incrimination clause when a statement is obtained by coercion but never used against the declarant. Justice Thomas's plurality opinion provided some definition for "criminal case" but Justice Souter's concurring opinion did not attempt to provide such a definition. There is no hint in any of these opinions that the use of an allegedly coerced statement at an initial appearance, after a criminal complaint has been filed, is not use in a "criminal case."[15]

Our decision in Weaver, as well as the case law we cited therein, lead us to conclude that in December 2001, when the confession was allegedly coerced, and in January 2002, when the confession was used at Higazy's bail hearing, it was clearly established that the use of the allegedly coerced statement at that hearing completed the violation of Higazy's Fifth Amendment's guarantee against compulsory self-incrimination.

### iii. Was Templeton's conduct objectively reasonable?

Where there is a dispute about the material facts, this question must be resolved by the fact finder. See Kerman, 374 F.3d at 109. Again, we assume for the purposes of this appeal that Templeton coerced Higazy's statements, because this issue was not raised before the district court; these facts were not disputed for the purposes of summary judgment. Although Templeton asked Higazy about his involvement in September 11, he later told Higazy, during the same

---

[15] The Supreme Court decided Chavez after Higazy's bail hearing, and thus its holding does not bear on the issue of qualified immunity. However, we find Justice Thomas's analysis helpful insofar as it demonstrates where the law stood when Chavez was decided.

21

interview, that he knew Higazy had nothing to do with the attack. On December 27, 2001, and in the days following the polygraph examination, Templeton could not have known exactly how he would use the confession because he could not predict the course that the case would take. The use of the confession would either ripen into a Fifth Amendment violation or it would not —that is the first question that we must examine, and a question that we have answered in the affirmative. Indeed, it ripened when it was used at the second bail hearing to deprive Higazy of his freedom. The objective prong of the qualified immunity test asks whether an officer in Templeton's shoes would have known that he was violating the right in question. We believe that a reasonable jury could conclude that he would.

For the purposes of our inquiry here, we conclude that when the facts are cast in the light most favorable to Higazy, an officer in Templeton's shoes would have understood that the confession he allegedly coerced from Higazy would have been used in a criminal case against Higazy and that his actions therefore violated Higazy's constitutional right to be free from compelled self-incrimination.

Templeton essentially argues that it was objectively reasonable for him to believe that this was not a criminal case and therefore his conduct was objectively reasonable. However, a reasonable fact finder could conclude that Templeton obtained the statements from Higazy so that they could be used in a criminal case against him. A reasonable fact finder could conclude that it was not reasonable for an officer to believe that it was constitutional to coerce a confession and then to hand that information to a prosecutor—without divulging the means by which the confession was acquired— for use in a criminal case.

22

B. Causation

The district court did not reach the issue of causation; instead it "summarize[d] defendant's argument" so it could "complete the description of the legal debate." Higazy, 346 F. Supp. 2d at 449. There are two separate questions that must be resolved at trial: whether Templeton caused the use of the allegedly coerced statements at the January 11, 2002 bail hearing and whether Templeton's conduct was a proximate cause of Higazy's detention after that bail hearing. Templeton argues that the actions of Higazy's lawyer, the prosecutor and the Magistrate Judge were superseding causes that cut off his liability.

Tort defendants, including those sued in Bivens actions, are responsible for the "natural consequences" of their actions. See Monroe v Pape, 365 U.S. 167, 187 (1961) (referring to defendants in Section 1983 actions); Kerman, 374 F.3d at 126 (same); Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000) (involving a Bivens action). We have explained that "'foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication.'" Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 216 (2d Cir. 2002) (quoting Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579 (N.Y. 1994)); see also McKinley v. City of Mansfield, 404 F.3d 418, 437–438 (6th Cir. 2005) ("It is hard to see how law enforcement officials could 'ultimately impair' the right against self-incrimination if not by compelling a suspect to make incriminating statements that are later used against him at trial. It is equally hard to see how officials whose conduct ultimately impaired a citizen's Fifth Amendment rights could nonetheless escape civil liability merely because a different state official put the statements into evidence at trial."). Based on the facts here, viewed in the light most favorable to the non-moving party, we conclude that the issues of causation depend on the resolution of issues

of fact that cannot be decided as a matter of law.  If the fact finder concludes that there were

superseding causes cutting off Templeton's liability, Higazy's action against him will fail.

We explained in Townes v. City of New York, 176 F.3d 138 (2d Cir. 1999), that an

action to vindicate a constitutional right (there, a Section 1983 action) employs the tort principle

of proximate causation.  Townes, 176 F.3d at 146.  The same is true of Bivens actions.  Cf.

Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir. 1998).  In Townes, we explained that this

Court adheres to the common law definition of superseding cause:  "an act of a third person or

other force which by its intervention prevents the actor from being liable for harm to another

which his antecedent negligence is a substantial factor in bringing about." Townes, 176 F.3d at

147 (quoting Restatement (Second) of Torts § 440 (1965)).[16]  The inquiry in Townes was

whether the conviction and incarceration were "proximately (or legally) caused by the

defendants' constitutional torts."  Id. at 146.  After applying proximate cause analysis, we found

that the unconstitutional search and seizure was not a proximate cause of the plaintiff's

conviction because of "the trial court's refusal to suppress the evidence, which is an intervening

and superseding cause of Townes's conviction."  Id.[17]

---

[16] Put differently, a superseding cause is "[a]n intervening act that the law considers
sufficient to override the cause for which the original tortfeasor was responsible, thereby
exonerating that tortfeasor from liability."  Black's Law Dictionary 213 (7th ed. 1999).

[17] Townes was decided as an appeal of a decision granting summary judgment, but there,
the facts were such that we could determine proximate cause as a matter of law.  The same is not
true here.

24

In Zahrey, 221 F.3d 342, we expanded our Townes holding: "there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty." Id. at 344. The question in Zahrey was framed as "whether the deprivation of liberty may be considered a legally cognizable result of the initial misconduct." Id. at 351. In Zahrey, we discussed our decision in Townes:

> In the context of criminal law enforcement, courts have differed as to the circumstances under which acts of subsequent participants in the legal system are superseding causes that avoid liability of an initial actor. If the subsequent participant exercises independent judgment, the chain of causation has sometimes been held to have been broken. Thus, in Townes v. City of New York, 176 F.3d 138 (2d Cir. 1999), we ruled that a trial judge's erroneous decision not to suppress unlawfully seized evidence was an exercise of independent judgment that avoided liability of the police officers who seized the evidence for the ensuing conviction and incarceration. See id. at 146–47. Police officers have also been insulated from liability for any deprivation of liberty resulting from their misconduct by the intervening acts of other participants in the criminal justice system.

Id. at 351 (citations and footnote omitted). However, the analysis did not end there. We immediately qualified our characterization of Townes:

> On the other hand, the Supreme Court has ruled that a judge's decision to issue an arrest warrant did not break the causal chain between the act of a police officer who submitted an affidavit and the arrest where "a reasonably well-trained officer in [the same] position would have known that his affidavit failed to establish probable cause." Malley v. Briggs, 475 U.S. 335, 345 (1986). Applying Malley, we have ruled that the decision of a sentencing judge does not break the causal chain between the wrongful recommendation of a probation officer and an unconstitutional sentence. See Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997), reinstated after opinion vacated, 173 F.3d 120, 121 (2d Cir. 1999); see also Wagenmann v. Adams, 829 F.2d 196, 212–13 (1st Cir. 1987) (decision of court clerk acting as bail commissioner in setting bail did not insulate police officer from liability for violating plaintiff's right to be free from excessive bail). We have also sustained a claim against a police officer, despite the subsequent

25

actions of a prosecutor and a grand jury. See White v. Frank, 855 F.2d 956, 962 (2d Cir. 1988) ("As with the grand jury . . . the public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false.")

Id. Based on this analysis, we explained:

These differing results seem to place in tension the principle that the "intervening exercise of independent judgment" will break a causal chain, Townes, 176 F.3d at 147, and the principle that defendants in section 1983 cases are liable for consequences caused by "reasonably foreseeable intervening forces," Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989) (internal quotation marks omitted). Some courts have sought to resolve the tension by considering the intervening act of a decision-maker not to be an exercise of truly independent judgment, and therefore reasonably foreseeable, if caused by pressure or misleading information provided by the actor whom the plaintiff seeks to hold liable.

Id. at 351–52.

While in Townes we observed that a defendant cannot rely on the alleged existence of a superseding cause when that subsequent decision-maker has been deceived by the defendant's actions, see Townes, 176 F.3d at 147, in Zahrey we explained that "[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty." 221 F.3d at 352. In a footnote, we explained that "[t]he initial wrongdoer might avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty, even in the absence of the antecedent misconduct; in that circumstance, 'but for' causation could be claimed to be lacking." Id. at 352 n.8. Zahrey

26

addresses a prosecutor who knowingly used wrongfully obtained evidence that he himself obtained, but says nothing about a police officer who might knowingly provide wrongful evidence.

Defendants in Bivens actions may be liable for consequences caused by reasonably foreseeable intervening forces; here, the chain of causation need not be considered broken if Templeton deceived the subsequent decision maker, see Townes, 176 F.3d at 147, or could "reasonably foresee that his misconduct [would] contribute to an 'independent' decision that results in a deprivation of liberty," Zahrey, 221 F.3d at 352. When the facts are viewed in the light most favorable to Higazy, we cannot conclude as a matter of law that there are sufficient superseding causes to cut off Templeton's liability.

Our recent decision in Wray v. City of New York, 490 F.3d 189 (2d Cir. 2007), is not to the contrary. There, a police officer who arranged an unduly suggestive station house showup was not found liable on a Section 1983 claim, because the violation of plaintiff's constitutional rights "was caused by the ill-considered acts and decisions of the prosecutor and trial judge," id. at 193, which the officer could not reasonably have foreseen. "It is always possible that a judge who is not misled or deceived will err; but such an error is not reasonably foreseeable . . . it is not the 'legally cognizable result' of an investigative abuse." Id. at 195. By contrast, construing the facts in the light most favorable to Higazy as the non-moving party, a fact finder could conclude that Templeton could reasonably have foreseen that a coerced confession would be used against Higazy and would lead to Higazy's detention.

27

While the record tells us very little about Templeton's actions following the polygraph examination, or Higazy's communications with his attorney about what transpired during the polygraph interview, there are genuine issues of material fact as to whether Templeton caused the use of the confession and whether Templeton's conduct was a proximate cause of Higazy's detention. At the January 11, 2002 bail hearing before Judge Maas, there were several factors that could have militated in Higazy's favor: there were at least twenty local people who vouched for him and said they would allow him to reside in their homes; Higazy had no criminal record; and Higazy had a brother in Ithaca, New York, and a girlfriend in Pennsylvania. Higazy was willing to accept supervisory conditions such as wearing an ankle bracelet and "any other monitoring device that the Court might deem necessary."

The government argued that Higazy was a flight risk because, inter alia, "his behavior since his arrest in mid-December [] has proven that he is a poor candidate for court supervision because he's repeatedly lied to law enforcement officers." Apparently referring to the Templeton interrogation, the government continued, adding: "[i]t's entirely possible given the number of different false statements he's made on different occasions an indictment would contain multiple counts." And shortly thereafter: "[h]e was questioned about the radio. At first [Higazy] denied ownership of the radio and later admitted ownership of the radio but told three different versions of how he had come into possession of the radio. So this is not somebody who can be deemed trustworthy, somebody who's not deemed untrustworthy. Other things being the same, I submit is not [sic] a good candidate for bail."

28

These arguments, in part, led Judge Maas to tell Higazy's attorney: "[o]n the face of it it appears that insofar as the complaint charges the defendant with making false statements, it seems to me [that the government] has the better of the argument in that this does seem to be a very strong case of false statements made by your client." [18]

There is not enough evidence in the record about what communications occurred between Templeton and the prosecutor, and Higazy and his attorney, to allow us to decide, as a matter of law, whether there were superseding causes cutting off Templeton's liability.

---

[18] While the factual allegations relating to the December 28, 2001, bail hearing, are not as relevant as the January 11, 2002, hearing, at which Higazy's Fifth Amendment rights were violated, we provide this short summary of the December 28 hearing because we believe it is sheds important light on the role of the confession in both hearings.

At the hearing on March 18, 2002, after the criminal charges against Higazy had been dropped, Judge Rakoff stated:

> This much I think we know, subject to hearing from counsel, and that is that either Mr. Higazy did not confess to the FBI agent, in which case the FBI agent made a misrepresentation to the court, via the AUSA, or, more likely, a false confession was obtained, which still had the effect, of course, of misleading the court but would have involved the same intent on the part of the agent. And at a minimum, one would think that some explanation would be forthcoming as to how a false confession could have been obtained, but none has been offered yet in any of the papers from the government.

Connecting the false confession to his decision to deny bail, Judge Rakoff explained:

> [W]hat happened was that [the government] represented flat out that the defendant had now admitted it was his radio, and then the court, in reliance on that, concluded that bail should be more obviously denied than had been the case earlier. I assume, because I have absolutely no reason to believe the U.S. Attorney's Office has been anything but accurate and forthright throughout these proceedings, that that was a fair statement of what [counsel for the government] had learned from the agent.

In his written order, Judge Rakoff characterized his decision to deny bail as a consequence of his learning that Higazy had confessed to owning the radio, In re Material Witness Warrant, 214 F. Supp. 2d at 359, explaining that he "was materially misled by being informed of a confession that subsequently was shown to be false," id. at 363.

29

## II. HIGAZY'S SIXTH AMENDMENT CLAIM

Higazy alleges that his Sixth Amendment right to counsel was violated at the December 27, 2001, polygraph interview when Templeton engaged in questioning after the polygraph examination was complete. Higazy's argument is that he waived his right to counsel only for the duration of the polygraph interview. For the reasons stated below, we affirm the district court's dismissal of Higazy's Sixth Amendment claim on the grounds of qualified immunity.[19]

A material witness detained pursuant to the material witness statute, 18 U.S.C. § 3144, has a statutory right to counsel under Section 3142. See 18 U.S.C. § 3142(f) ("At the hearing, such a person has a right to be represented by counsel, and, if financially unable to obtain adequate representation, to have counsel appointed."); § 3142(I) ("In a detention order issued under subsection (e) of this section, the judicial offer shall . . . (3) direct that the person be afforded reasonable opportunity for private consultation with counsel.")

At the time of the interrogation in this case, there was no clearly established right to counsel for a material witness that was guaranteed by the Sixth Amendment as opposed to the

---

[19] We do not reach the issue of whether Higazy's Sixth Amendment rights were violated, because principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case. See Ehrlich v. Town of Glastonbury, 348 F.3d 48, 57 (2d Cir. 2003) (recognizing that, consistent with Saucier v. Katz, 533 U.S. 194 (2001), ("we may [in certain circumstances] move directly to [the question of qualified immunity] and refrain from determining whether a constitutional right has been violated"); Anobile v. Pelligrino, 303 F.3d 107, 123 (2d Cir. 2001) (holding that to determine whether a search exceeded a constitutionally allowable scope after disposing of the issue on other grounds violated the principle of judicial restraint.)

statutory right to counsel that was guaranteed under the material witness statute. In Center for National Security Studies v. United States Department of Justice, 331 F.3d 918, 922 (D.C. Cir. 2003), the D.C. Circuit noted in dicta that "criminal detainees and material witness detainees are free to retain counsel and have been provided court-appointed counsel if they cannot afford representation, as required by the Sixth Amendment to the Constitution." (Emphasis added.) However, we know of no court, including our own, that has held that a material witness has a Sixth Amendment right to counsel before charges have been filed against the material witness, because it is unclear how the "initiation of adversary judicial proceedings" could occur in this context prior to the presentation of a "formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 689 (1972) (plurality opinion). Accordingly, we therefore affirm the district court's dismissal of this right to counsel claim on the grounds of qualified immunity, because there was no violation of a clearly established right under the Sixth Amendment here. See Harlow, 457 U.S. at 818.

CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Higazy's Fifth Amendment claim as to the hearing of December 28, 2001, and Higazy's Sixth Amendment claim as to the interrogation of December 27, 2001, but we vacate the district court's dismissal of Higazy's Fifth Amendment claim as to the January 11, 2002 bail hearing. The case is remanded for further proceedings consistent with this opinion.

31

DENNIS JACOBS, <u>Chief Judge</u>, concurring:

I concur in the majority opinion insofar as it affirms the dismissal of the Sixth Amendment claim and the dismissal in part of the Fifth Amendment claim. I also concur in the remand to the district court to reinstate the Fifth Amendment claim as to the January 11, 2002 bail hearing, but I respectfully disagree as to the grounds for doing so.

The surviving claim in this <u>Bivens</u> action is that, during a polygraph test, defendant Templeton coerced a confession that later became a basis for the deprivation of Higazy's liberty at the January 11 bail hearing. (The parties assume the fact of coercion solely for the purpose of the summary judgment motion.) The Fifth Amendment protects the right not to be a witness against oneself in a criminal case; but "mere coercion does not violate the text of the Self-Incrimination Clause absent <u>use</u> of the compelled statements in a criminal case against the witness." <u>Chavez v. Martinez</u>, 538 U.S. 760, 769 (2003) (emphasis added); <u>see</u> <u>Weaver v. Brenner</u>, 40 F.3d 527, 534-35 (2d Cir. 1994). Under settled law of this Circuit, the Fifth Amendment

1

violation that flows from a coerced confession transpires only if and when the confession is used in court, and even then, the officer who coerced the confession is liable only if the officer conceals the coercion; absent concealment of the circumstances amounting to coercion, the error of the court in accepting the confession is treated as a superseding cause.  See Point I, infra.

Notwithstanding this precedent, the majority thinks that Higazy need show no more than "that Templeton could reasonably have foreseen that a coerced confession would be used against Higazy and would lead to Higazy's detention." Maj. Op. at 27, supra.  In an error that flows from that error, the majority presumes that proximate cause is a jury question in the odd circumstance of this case, where the criminal defendant failed to challenge the confession in court.  This odd circumstance limits the influence of the majority's error to the odd facts of this case.  But I write to emphasize that, oddball facts notwithstanding, our precedents remain intact.

# I.

Under our precedents:  where the constitutional injury flowing from alleged official misconduct occurs only when the results of that misconduct are <u>used</u> in a criminal proceeding, the burden is on the Section 1983 plaintiff to allege and prove that the defendant official was the proximate cause of the <u>use</u>.  Thus, in <u>Townes v. City of New York</u>, 176 F.3d 138 (2d Cir. 1999), we dismissed a Section 1983 claim arising out of an illegal search and seizure where the plaintiff was unable to show that his subsequent conviction and incarceration were "fairly traceable" to the police misconduct.  <u>Id.</u> at 141.  The complaint alleged that the plaintiff's injury was the foreseeable result of the officers' misconduct because he would not have been convicted but for the illegally seized evidence.  This was insufficient to state a claim that the officers proximately caused his injury, because the trial judge's decision to admit the illegally seized evidence was a superseding cause of the constitutional injury.  The trial judge's "exercise of independent judgment in deciding not to suppress the evidence, though later ruled to be erroneous, broke the

chain of causation for purposes of § 1983 liability." Id. at 147. We held:

> It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment. At least that is so in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment.

Id. (citations omitted).

Again, in Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000), we recognized that "a person whose initial act is the 'but for' cause of some ultimate harm (i.e., the harm would not have happened but for the initial act) is not legally liable for the harm if an intervening act is a 'superseding cause' that breaks the legal chain of proximate cause." Id. at 351 n.7 (citing Restatement (Second) of Torts § 440 (1965)). Applying this principle in the law enforcement context, we held that the causal chain between official misconduct and injury to a criminal defendant is broken when a subsequent participant exercises judgment that is "truly independent"--judgment that is not the product of "pressure or misleading information provided by the actor whom the plaintiff seeks to hold liable." Id. at 351-52. In Zahrey, a prosecutor was accused of manufacturing false evidence

4

which he then introduced at a grand jury proceeding.  We reinstated the Section 1983 claims against him because his fabrication compromised the judgment of intervening actors who authorized the indictment and arrest of the plaintiff-- the plaintiff having had no opportunity to object.  In dicta, Zahrey declined to decide whether "the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."  Id. at 352.  The majority opinion here relies on this question in dicta to ignore more recent precedent that furnishes the answer.

In Wray v. City of New York, 490 F.3d 189 (2d Cir. 2007), the plaintiff similarly was required to show more than that the use of illegally obtained evidence was foreseeable to the defendant officer; the plaintiff had to show the defendant proximately caused the use of the evidence.  Id. at 195.  The plaintiff in Wray had been convicted and jailed after a trial in which the prosecutor introduced--and the trial judge refused to suppress--an unduly suggestive showup identification.  After a habeas court found the admission of this evidence to be reversible

5

error, the plaintiff sued the police officer who had conducted the identification procedure. We held that the officer was entitled to summary judgment because the plaintiff failed to introduce evidence that the officer misled or pressured the prosecution or trial judge to use the suggestive showup identification. Id. at 193. "[T]he alleged conduct of [the officer] was not in itself illegal or unconstitutional. The constitutional harm occurred when the showup was impermissibly used to compromise the fairness of [plaintiff's] trial--at behest of the prosecutor, by order of the trial court, and beyond [the officer's] control." Id. at 194.

Our cases affirm that traditional tort law principles apply equally to a Section 1983 plaintiff and require him to show the causal link from the original police misconduct up to the point of injury in order to proceed on his claim.

## II.

The majority opinion misapplies our precedent because it misconceives the constitutional violation. The majority pays lip service to settled law that the constitutional violation occurs only when a coerced confession is actually

6

used against a defendant in a criminal case, but its analysis implicitly depends on localizing the constitutional violation in the interview room and on finding the violation complete when the confession was coerced. This error is manifest in the majority's treatment of events subsequent to the coerced confession. Thus, the majority sees insufficient record evidence to determine whether subsequent events constitute "superseding causes cutting off Templeton's liability," Maj. Op. at 29, supra; but instead of deciding that Higazy thereby failed to offer evidence sufficient to resist summary judgment, the majority puts the burden on Templeton, whose liability is assumed unless he can disprove causation. The majority thus betrays its mistaken assumption that Templeton's liability attached when he (allegedly) coerced the confession.

Under our case law, liability could not possibly attach until the January 11 bail hearing that resulted in the wrongful detention. At the risk of being obvious, the denial of bail was the cause of Higazy's detention. The constitutional prohibition against use of coerced statements could not have been violated until that hearing, when the statements were "used." Such a hearing is ordinarily

7

controlled by the judge with the participation of counsel.

Higazy would have been aware that his confession was coerced

and could tell his lawyer; causation would be interrupted if

he failed to do so, or if he told his lawyer who then failed

to raise the issue--or if the issue were raised, and despite

truthful testimony as to what (allegedly) happened in the

interview room, the judge decided to accept the confession.

In order to get to a jury, the burden is on Higazy to show

that Templeton misled or pressured a party to the hearing

such that Templeton compromised that party's independent

judgment in offering, relying on, or failing to object to

the use of the coerced confession.

Contrary to reason and experience, the majority assumes

that it is reasonably foreseeable that a party will fail to

protect his own rights.  Just as an officer who has coerced

statements is not expected to foresee a trial judge's error

in denying a suppression motion, see Maj. Op. at 27, supra

(citing Wray, 490 F.3d at 195), he should not be expected to

foresee that defense counsel will decide to forgo any

objection to admissibility--unless the defendant's ability

to object has been somehow compromised or undermined by the

police.  In the majority's view, Higazy's failure to adduce

8

evidence of causation makes this a jury case. The majority thus implicitly relieves plaintiff of the burden of demonstrating that he will introduce evidence sufficient to allow a reasonable jury to find the defendant's conduct was a proximate cause of the constitutional violation, and (on a summary judgment motion) the majority displaces the burden of production to the police officer to show as a matter of law that the officer did not deceive the intervening actors and that the officer could not foresee the use of the statements.

**III**.

The majority's analysis is gratuitous because in this case there is sufficient record evidence of proximate cause to preserve Higazy's claim without the majority's muddled discussion about foreseeability. The record reveals a genuine issue of fact as to whether Templeton took an affirmative step to mislead defense counsel about the circumstances under which the statements were obtained, and thereby compromised Higazy's opportunity to object to the use of the allegedly coerced statements.

9

Higazy attested that at some point before the January 11 hearing his attorney "asked me why did I say what I did. I told him that my family was threatened." Higazy Aff. at 5, Sept. 23, 2002. Higazy further attested that the next time he met with agents in his attorney's presence, his attorney "asked me to confront [Templeton] with what I said he said. I did. He [Templeton] denied it." Id. An affidavit provided by Templeton corroborates this account:

> [On January 8,] I was met by the attorney who informed me his client would not take this [second polygraph] test because the writer had threatened him, and his client was now denying ownership of the radio. . . . The accusation of the threat was denied by writer . . . . The attorney requested that I hear the complaint directly from the client. . . . [Higazy] stated "all I can remember is you saying that you would see to it that the Egyptian security service make my parents lives a living hell." Writer denied to [Higazy] and the attorney that the threat was made . . . . [W]hen informed [by the writer] that [Higazy] was advised by the writer of the attorney's presence and availability at any time, the attorney asked [Higazy] if what the writer had said was true, [Higazy] advised the attorney that he couldn't remember. The attorney asked [Higazy] again, "did he (the writer) tell you that?" [Higazy] responded, "I can't remember. I'm not a human tape recorder."

Templeton Aff. at 11-12, Oct. 25, 2002 (emphasis added). A reasonable jury (if it found coercion, in the first place) could infer from these circumstances that Templeton's flat denial of coercion impaired counsel's independent decision

10

(either because it convinced the lawyer that his client was lying or because the lawyer believed that an objection would not withstand Templeton's denial), and therefore effected causation.[1] I would rule on this basis, and that is why I concur in the result.

---

[1] At the January 11 hearing itself, defense counsel's statements make clear that he had decided not to raise Higazy's allegations in any detail:

> He was unable to complete the lie detector exam. I don't want to get into hurling accusations back and forth that which was provided to me by the defendant and those that are attested by the Government as to who pressured who into saying what, what misconstrued what one other said.

Tr. of Arraignment at 24, Jan. 11, 2002. Higazy's counsel did in fact argue the statements were inadmissible because they were outside the scope of Higazy's waiver, but counsel only hinted at coercion:

> [W]hatever occurred during those sessions was a limited waiver for the purpose of him being submitted to a polygraph examination. . . . So I don't know what happened in that room or didn't happen in that room, but other than the results of a polygraph it's off the table.

Id.

11